OPINION
{¶ 1} Defendant-appellant Shane Mitchell appeals from his convictions of murder, aggravated robbery and tampering with evidence entered after a jury trial in the Columbiana County Common Pleas Court. He contends that inadmissible opinions on his credibility were admitted and raises ineffective assistance of counsel if waiver is found. He contests the admission of photographs of the decedent's child. He states that he was prejudiced by the ex parte voir dire of a juror who realized that she knew the mother of a state's witness. He complains about the seating of talesmen where the jury pool was depleted. He further alleges that the autopsy report from another county coroner was hearsay and that the Columbiana County Coroner was improperly permitted to testify regarding the contract coroner's autopsy. Finally, he alleges that the court should have instructed on the lesser included offense of involuntary manslaughter. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF FACTS {¶ 2} In the early morning hours of December 11, 2004, nineteen-year-old Shane Mitchell [hereinafter appellant] attended a keg party and then went to The Side Door Tavern in Salem, Ohio. In the course of his time at the bar, appellant concocted a scheme to obtain money. He decided to pretend to act as an intermediary in a drug sale but to actually abscond with the buyer's money. He recruited Richard Forrester, an old school friend he happened across at the bar, to assist him in perpetrating the scheme. (Tr. Vol. III at 36-38; Vol. IV at 54).
 {¶ 3} They encountered a woman at the bar who wished to purchase cocaine. She testified that appellant kept pestering her about giving him money so he could purchase the drugs; however, she was leery of trusting him. (Tr. Vol. II at 140). The woman then involved Bradley Van Horn [hereinafter the victim] in the discussions with appellant. At one point in the negotiations, appellant yelled at the woman and seemed to move to hit her when the victim intervened. (Tr. Vol. II at 143-144, 165, 176). According to appellant, the victim pushed him at that time. (Tr. Vol. IV 88-89). *Page 3 
 {¶ 4} Still, the victim decided to accompany appellant on the drug run. Appellant asked his cousin, A.J. Coffman, to drive him, Forrester and the victim down the street. They left the bar in Coffman's car just before 2:00 a.m. Coffman was directed to park at a church and keep the car running. (Tr. Vol. III at 269-270; Vo. IV at 58). Coffman waited in his vehicle as the other three walked behind the church. He heard four or five noises (like flesh hitting flesh), and then, appellant and Forrester returned with blood on their hands. (Tr. Vol. III at 271-272, 275, 283). Coffman heard Forrester comment about kicking the victim in the face. (Id. at 277).
 {¶ 5} Coffman drove appellant and Forrester back to the party they attended prior to arriving at the bar. A witness from the party testified that he saw both Forrester and appellant reenter the party after 2:00 a.m. (Id. at 238, 240). They explained that they had been in a fight, and they showed this witness the scrapes to their hands. (Id. at 240-241). In the meantime, Coffman arrived at his girlfriend's house upset and seeking advice. (Tr. Vol. II at 227-229; Vol. III at 279). He then went home to wake his father. Coffman's father, who is also appellant's uncle, returned to the church with him to determine if someone was injured. (Tr. Vol. I at 264). They found the victim bloodied and unresponsive. A routine patrol car happened by at 4:20 a.m. and an ambulance was called. However, the victim was already deceased.
 {¶ 6} That morning, appellant called Coffman's father and claimed that he did not engage in any act of violence and that it was Forrester who punched the victim in the back of the head and kicked him. (Id. at 274-275). Upon learning that he had been identified as a suspect, appellant then voluntarily appeared at the police station. (Tr. Vol. II at 59). Photographs of his hands were taken depicting scrapes on the knuckles of both hands. (Id. at 38). Appellant explained these away as being caused by a punching bag at his house and his habit of picking at his skin. At trial, a girl confirmed that his hands looked the same at the end of the night as they did at the beginning of the night. (Tr. Vol. III at 9, 18).
 {¶ 7} Appellant conceded to police that he had formulated a plan to pretend to be able to buy cocaine in order to obtain money. (Tr. Vol. IV at 48-49). He claimed that it was Forrester who began the assault, punching the victim from behind as they *Page 4 
walked around the church. (Tr. Vol. IV at 60). He said Forrester may have punched the victim again, causing the victim to fall to the ground.
 {¶ 8} Appellant testified that he grabbed the victim's shoulder (admittedly still thinking about getting into his pockets) just as Forrester unexpectedly kicked the victim in the face, which caused blood to spray on appellant. (Id. at 60-65, 98, 102, 109). Appellant claimed that he turned back to the car as Forrester started going through the victim's pockets because he wanted no part of the theft after seeing the victim kicked in the face. (Id. at 66, 102, 104). Appellant denied that he ever struck the victim. (Tr. Vol. IV at 66, 79). After initially denying that he ever had the victim's wallet, he then changed his statement and related that Forrester left the wallet at the party so he took it and threw it in a dumpster, where it was later discovered by police at his direction. (Tr. Vol. II at 83, 86; Vo. IV at 75-76).
 {¶ 9} Appellant admitted that upon learning that the victim had died, he burned his clothes because he was scared. (Tr. Vol. IV at 74; Vol. II at 64, 83-84). No blood evidence could be discovered on the burnt clothing. The tennis shoes he was wearing were intact and had no indication of blood on them. (Tr. Vol. II at 70, 79). The floormats in the back of the car where he rode after the assault also tested negative for blood whereas the front passenger floormat, where Forrester rode, tested positive for blood. (Tr. Vol. III at 129-131). Blood was also discovered on the steering wheel, the back of the passenger seat and on the lever used to fold the front seat down in order to reach the back seat. (Tr. Vol. III at 198, 213).
 {¶ 10} While appellant was being interviewed by police, Forrester was arrested with a bottle of the victim's prescription pills, abrasions on his knuckles and blood on his clothes and on his steel-toed boots. (Tr. Vo. II at 48; Vol. III at 85-86). His mother found the victim's money clip in his room. (Tr. Vol. III at 107). Forrester initially denied involvement in any manner. (Tr. Vol. II at 69; Vol. III at 79). Upon seeing his mother, however, he confessed in front of police. (Tr. Vol. III at 105). He then gave a statement to police incriminating himself and appellant equally. (Tr. Vol. III at 75). After a motion to suppress his statement was denied in his own case, Forrester pled guilty to felony murder and testified for the state. He received a mandatory sentence *Page 5 
of fifteen years to life for murder, and the state dismissed the aggravated robbery charge. (Vol. III at 24-25).
 {¶ 11} According to Forrester, he pretended to speak with a drug dealer on his cellular telephone upon arriving at the church. Appellant then told the victim that he could not proceed to the dealer's house with them. (Tr. Vol. III at 41-42). Forrester said that when the victim hesitated, appellant tried to grab the money from the victim's hand. However, the victim grabbed appellant and they wrestled to the ground. (Tr. Vol. II. at 43). The victim, who was bigger than appellant, ended up on top; so, Forrester, who is six foot two inches tall and weighs two hundred twenty-five pounds, tried to punch the victim. (Tr. Vol. II at 31). Forrester said that his drunken state caused his attempted punch to miss. He then kicked the victim off of appellant. (Id. at 44-46). He disclosed that he and appellant then each punched the victim in the face five or six times. (Id. at 46-47). He also testified that they both kicked the victim's head and upper body until he was no longer moving and seemed to be snoring. (Id. at 47-48, 62). Forrester said that appellant rolled the victim over and they went through his pockets. (Id. at 48, 64). Back at the party, they went to the basement and spread out the stolen property. Forrester testified that appellant said he was going to take the money to buy cocaine. (Id. at 51).
 {¶ 12} This testimony was all presented at the jury trial which began on September 13, 2005. The jury found appellant guilty (as charged) of murder, aggravated robbery and tampering with evidence. On September 26, 2005, the court sentenced appellant to a mandatory sentence of fifteen years to life for murder, six years for aggravated robbery and three years for tampering with evidence all to run consecutively. Appellant filed timely notice of appeal.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 13} Appellant's first assignment of error provides:
 {¶ 14} "THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE IRRELEVANT AND IMPROPER EVIDENCE PREJUDICIAL TO THE DEFENDANT/APPELLANT IN THE FORM OF OPINION EVIDENCE AS TO THE DEFENDANT/APPELLANT'S CREDIBILITY AND A PHOTOGRAPH OF THE DECEDENT'S MINOR CHILD, WHICH HAD NO EVIDENTIARY VALUE." *Page 6 
 {¶ 15} Appellant makes separate complaints under this assignment of error about the admission of certain testimony and the admission of a photograph contained within the victim's stolen wallet. The trial court's admission or exclusion of such evidence is reviewed under the abuse of discretion standard of review. See State v. Hartman (2001),93 Ohio St.3d 274, 281.
 {¶ 16} Appellant's first claim is that two witnesses were improperly permitted to state their opinions on appellant's credibility. He cites only to a Supreme Court case where a pediatrician opined that a child rape victim had not fantasized or been coached to make the accusations against her father. See State v. Boston (1989), 46 Ohio St.3d 108. He focuses on the following holding from Boston:
 {¶ 17} "We have little difficulty in finding that the admission of this testimony was not only improper — it was egregious, prejudicial and constitutes reversible error. In Eastham [(1988), 39 Ohio St.3d 307,312], Justice Brown, concurring, stated that such an opinion `* * * acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility. * * * In our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses.'
 {¶ 18} "We agree with this statement and hold that an expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant. We further find that it was error, and more than harmless, for the trial court to have permitted Dr. Asch to render an opinion on the veracity of Cynthia."
 {¶ 19} Appellant believes that this holding requires reversal of his conviction as well. First, he points out the following passages where the state asked Detective Brown:
 {¶ 20} "Q. Does the evidence corroborate or match with his story [objection overruled] regarding the assault.
 {¶ 21} "A. The evidence does not match his statement." (Tr. Vol. II at 84).
 {¶ 22} "* * *
 {¶ 23} "Q. Does the evidence bear out that Shane Mitchell's statement about the assault is the truth? [objection overruled] *Page 7 
 {¶ 24} "A. No." (Id. at 88).
 {¶ 25} These evidentiary admissions are distinguishable from the situation in Boston. First, this was not a situation where a witness attests to the credibility of a child-victim who had been found incompetent to testify (thus eliciting confrontation issues). Further, there was no expert purporting to testify as to whether a person was speaking truthfully based on abstract concepts. See, e.g., State v.Watkins (Sept. 7, 2000), 8th Dist. No. 77051 (an officer can testify as a lay witness that he believed the defendant was lying in his statement due to inconsistent answers). This was a description of the defendant's own statement, which was admissible as a statement of a party opponent, and the investigating detective's opinion as to whether the evidence he collected corroborated the statement. Such physical evidence was viewed by the jury as well.
 {¶ 26} Boston did not deal with a mere opinion that the child's statements were corroborated by certain evidence collected by the physician or that the defendant's statement was not so corroborated. Rather, an expert witness opined that the child's accusations were credible in a case where the child victim was found incompetent to testify. "Boston does not proscribe testimony which is additional support for the truth of the facts testified to by the child, or which assists the fact finder in assessing the child's veracity." SeeState v. Stowers (1998), 81 Ohio St.3d 260, 263 (holding that expert witness's testimony that the behavior of an alleged child victim of sexual abuse is consistent with behavior observed in sexually abused children is admissible under the Ohio Rules of Evidence).
 {¶ 27} Here, the detective specifically disavowed any claim that he could tell if appellant was lying. He simply testified that the evidence that he collected and utilized in his investigation did not support appellant's statement on how the assault took place. Appellant claimed to police that the victim was punched once while standing, may have been punched one more time and was kicked only once. However, the physical evidence collected in the investigation established otherwise, and the detective testified accordingly. The detective was present at the crimescene, he personally viewed the body and blood spatter, and he evaluatedthe findings regarding the number and placement of blows sustained. *Page 8 
 {¶ 28} As the state points out, the detective's testimony was rationally based on his own perception and helpful to a clear understanding of his testimony or to the determination of a fact in issue as required for opinion testimony under Evid.R. 701. "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evid.R. 704.
 {¶ 29} Regardless, as the state points out, the above questions werenot posed on direct examination of the detective but rather were askedonly after the defense opened the door on the issue of whetherappellant's statement was consistent with the evidence. Specifically, the first disputed question took place on redirect, the second took place on further redirect, and both were related to the subject of the defense's line of questioning. That is, on cross-examination, the defense had employed a strategy of comparing individual portions of appellant's statement with various pieces of other evidence to show that appellant's statement was consistent with the evidence. (Id. at 63-70, 72-73). Basically, counsel's tactic was to show how many "consistent and honest" statements appellant made in order to imply that every claim he made was honest. (Id. at 72). On recross, defense counsel continued his strategy, emphasizing how appellant honestly stated where the wallet could be found and what he did with his clothing. (Id. at 86). Counsel pointed out that the detective could not know whether appellant was telling the truth or lying. (Id. at 88). Based upon this defense strategy, the trial court had the discretion to find that the defense opened the door to the state's line of questioning.
 {¶ 30} Next, appellant similarly complains that an investigator (from the prosecutor's office) presented testimony on appellant's credibility. This investigator was also at the crime scene to view the body and present for appellant's initial interview. The state asked the investigator to explain the purpose of re-interviewing appellant the day after his arrest. The investigator responded, "I didn't believe that Shane Mitchell was being truthful — wasn't being truthful with us when he gave us his account of what happened that evening * * *." (Id. at 110). He also explained that he informed appellant that he did not believe his statement was truthful as his version of the assault did not "jive" with the crime scene. (Id. at 112). *Page 9 
 {¶ 31} On cross-examination, defense counsel reiterated that the investigator did not think appellant was telling the truth and attempted to get the investigator to admit that this was merely his personal opinion. (Id. at 123). Then, on redirect, the state asked the investigator to explain further why it was not just a personal opinion and what evidence he saw causing him to believe that appellant was lying. It was at this point that the defense objected, albeit unsuccessfully. The investigator then explained how the victim was obviously struck more times than appellant's story allowed and noted the large amount of blood spray. (Id. at 128-129). He then opined that appellant's version did not fit the autopsy results either. (Id. at 129).
 {¶ 32} Since this was redirect, it was permissible rebuttal of the cross-examination on this same topic. As such, the court did not abuse its discretion in denying the objection to the redirect. This leads back, however, to the question of whether the answers originally received on direct examination of the investigator were admissible.
 {¶ 33} Yet, no objections were entered during the disputed portion of direct examination. (Id. at 110, 112). A timely objection must be made in order to preserve the error for appellate review. Evid. R. 103(A)(1). Thus, the state claims waiver of any errors in allowing the investigator to testify on direct as to why he did not believe appellant's version of events was the truth. The state also posits that the door was open to such questioning of the investigator since appellant had already questioned the detective on appellant's honesty and consistency.
 {¶ 34} Appellant urges that he was not required to object to the investigator's testimony because the trial court had already overruled similar objections regarding the detective's testimony as discussed above. In the alternative, appellant claims ineffective assistance of counsel due to the lack of objection. (This is also raised by appellant in assignment of error number six, but since it relates to this assignment, it is discussed here.)
 {¶ 35} Even if appellant were correct (that more objections would have been futile due to the trial court's earlier ruling concerning the detective's testimony), then it would logically follow that later evidentiary admissions are proper if the trial court's earlier ruling was proper. As we held above that the trial court did not abuse its *Page 10 
discretion in permitting the detective's testimony on the truth of appellant's statement, we could extrapolate (under appellant's theory) that the later admission of the investigator's testimony is not an abuse of discretion either. The door, once opened, remained opened on the topic of the truthfulness of appellant's statement and its contradiction with the physical evidence.
 {¶ 36} As for ineffective assistance of counsel in this regard, the defendant must establish deficient performance which caused prejudice to the defense. Strickland v. Washington (1984), 466 U.S. 668, 687;State v. Bradley (1989), 42 Ohio St.3d 136, 142. This breaks down into a two-pronged test: deficiency and prejudice.
 {¶ 37} In order to establish that counsel's performance was deficient, the defendant must demonstrate that the performance fell below an objective standard of reasonable representation by the commission of a serious error. State v. Keith (1997), 79 Ohio St.3d 514, 534. Counsel is presumed competent. State v. Thompson (1987), 33 Ohio St.3d 1, 10. We do not use hindsight to second-guess instances of trial strategy that backfire as there is a wide range of professional competence and of appropriate trial tactics. State v. Carter (1995), 72 Ohio St.3d 545,558. See, also, State v. Tibbetts (2001), 92 Ohio St.3d 146, 166
(generally, deficient performance cannot be found in tactical maneuvers). Moreover, "a trial attorney does not violate any substantial duty in failing to make futile objections." State v. McLeod (Dec. 12, 2001), 7th Dist. No. 00JE8, quoting State v. Mitchell (1988),53 Ohio App.3d 117, 119.
 {¶ 38} To then demonstrate that he was prejudiced by the deficient performance, the defendant must show that there exists a reasonable probability that were it not for counsel's errors, the outcome of the proceedings would have been different. Keith, 79 Ohio St.3d at 534. In evaluating prejudice, we thus consider whether our confidence in the outcome is undermined as a result of the established deficiency.Bradley, 42 Ohio St.3d at 142.
 {¶ 39} Here, counsel's trial tactics did not constitute deficient performance or prejudice the defense. Counsel had a strategy of showing that appellant was cooperative and honest with investigators. One aspect of this strategy was to emphasize that appellant voluntarily appeared at the police station. Another aspect was to point out all the parts of appellant's statement that were confirmed by *Page 11 
investigators and thus consistent with the evidence. Over and above this, counsel characterized parts of appellant's statement as honest and truthful and tried to get the detective to agree with this characterization.
 {¶ 40} As aforementioned, such a strategy cleared the state to rebut these suggestions with evidence that not every portion of appellant's statement was in fact consistent with the evidence (because for instance there was more blood spray and more injuries than could have been caused by one or two punches and one kick). This risk does not invalidate the strategy. The trial tactic employed was not a serious error but rather a discretionary strategy. Moreover, our confidence in the outcome is not undermined where law enforcement points to those parts of a defendant's statement that do not match the physical evidence collected. Notably, such physical evidence was also presented for the jury's own judgment. As such, the first issue presented in appellant's first assignment of error is overruled.
 {¶ 41} The second issue presented in this assignment deals with the admission of a photograph of the decedent's infant child. Related to this issue, appellant directed police where to find the victim's wallet, and they recovered a wallet from the dumpster he identified. The wallet contained various photographs, cards and documents. The state offered the wallet and its contents in a box as State's Exhibit 27. The state also offered Exhibit 8-ZZ, a photograph of the wallet open to an insert which displayed two pictures, one of a newborn and one of an older baby. (Tr. Vol. III at 152).
 {¶ 42} The victim's fiancée testified that she and the victim had a child, who was eight months old at the time of the victim's death. (Tr. Vol. II at 196-197). She explained that she sat in the car outside the bar with this child waiting for the victim to return from his journey with appellant. (Id. at 205). She then identified the wallet as her fiancée's and identified a photograph of her son contained in the wallet. (Id. at 212). The victim's mother also identified the wallet and the baby picture in it. (Tr. Vol. IV at 11).
 {¶ 43} After the testimony of the victim's fiancée, the state moved to admit the exhibits displayed to her. The defense objected to the photograph part of the exhibit, suggesting it was irrelevant since the fiancée was able to identify the wallet by other features and accusing the state of using the photograph to evoke sympathy. (Tr. Vol.II *Page 12 
at 212-213). The court allowed the exhibit to be admitted. (Id. at 213). Later, when sifting through the exhibits, the defense objected to Exhibit 8-ZZ, generally arguing that the probative value of multiple exhibits was outweighed by the prejudicial effect. (Tr. Vol. III at 148-149). The court admitted Exhibit 8-ZZ. (Id. at 154, 156). Appellant now contests these evidentiary decisions.
 {¶ 44} At the onset, we hold that the photographs of the child themselves were admissible. Relevant evidence is that which tends to make the existence of a fact of consequence more or less probable. Evid.R. 401. The child's pictures were relevant as they were contained in the stolen wallet. Thus, they helped to identify the wallet as that of the victim. The fact that the wallet contained pictures of the victim's child made the existence of the fact that the wallet was truly that of the victim more probable. This is true regardless of the fact that the state could have used other evidence in the wallet to identify it as the victim's as well.
 {¶ 45} Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A). Here, the probative value of the evidence was high. Moreover, the jury already knew that the victim was the father of a baby boy due to the fiancée's testimony. Contrary to appellant's argument, the probative value of the photographs contained in the wallet was not substantially outweighed by the danger of unfair prejudice or the like. See State v.Howard, 12th Dist. No. CA83-07-048, 2002-Ohio-3983, ¶ 18 (agreeing that photograph of victim's child was admissible to show wallet found in trash can was that of murder victim).
 {¶ 46} The real issue appears to be whether the trial court properly admitted a photograph of the wallet open to the baby pictures inaddition to the wallet's actual contents. Appellant claims that Exhibit 8-ZZ is an enlargement. Since the state can rationally seek to ensure the jury can view the relevant evidence from the jury box as it is identified, enlargements are permissible. "[S]ize alone [does not] automatically increase the prejudicial aspect of the photographic evidence in question." See State v. Biros (1997), 78 Ohio St.3d 426, 444
(dealing with gruesome photographs which have an even more stringent test than the evidence rules). Regardless, when compared to Exhibit 27, which is the box containing the actual wallet and contents, it becomes *Page 13 
apparent that the photograph represented by Exhibit 8-ZZ is in facta reduction, not an enlargement.
 {¶ 47} As for any allegations of the repetitive nature of admitting the photograph of the open wallet when the wallet itself was also admitted, a rational trial court could find that the probative value of the exhibit was not substantially outweighed by the danger ofunfair prejudice. Accordingly, the trial court's decision to admit such exhibit was not unreasonable, arbitrary or unconscionable.
 {¶ 48} As to any suggestion that the photograph was a needless presentation of cumulative evidence under Evid.R. 403(B), the exclusion option under that rule is not mandatory but is wholly discretionary. Moreover, the photograph was not a needless presentation of cumulative evidence, as the state can reasonably expect that neither the witness nor the jury would want to touch the actual wallet, which was conspicuously labeled as a biohazard. Thus, the photograph of the open wallet showing the photographs already found to be admissible identification evidence was a valid exhibit. For all of the foregoing reasons, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 49} Appellant's second assignment of error provides:
 {¶ 50} "THE TRIAL COURT ERRED IN FAILING TO CONDUCT A FAIR, COMPLETE AND THOROUGH INQUIRY REGARDING JUROR REYNOLD'S CONTACT WITH MRS. COFFMAN AND BY CONDUCTING ITS LIMITED IN-CAMERA INQUIRY OUTSIDE THE PRESENCE OF THE DEFENDANT/APPELLANT."
 {¶ 51} Mrs. Coffman is A.J. Coffman's mother and appellant's aunt. Her husband is A.J.'s father, who also testified for the state regarding his role in discovering the victim. Mrs. Coffman was not a witness but was apparently present for the trial. On the third day of trial, the state disclosed that the attorney who represents the Coffmans had disclosed that Mrs. Coffman:
 {¶ 52} "was approached by a female member of the jury who made some remark that she now realizes that — she wondered if that's who that was, Coffman. She was acquainted with A.J. Coffman's mother.
 {¶ 53} "[other prosecutor]: Through an acquaintance. *Page 14 
 {¶ 54} "[original prosecutor]: Somehow through an — used to work together years ago. We told that to counsel so we just want to make the record clear on that. It sounds like one of those things where the juror realized in the course of this that she was acquainted indirectly with the family." (Tr. Vol. III at 165-166).
 {¶ 55} Defense counsel responded:
 {¶ 56} "Your Honor, we certainly appreciate that they told us that. The other thing is that that might be something during the break or something that the Court wants to make an inquiry of that person by the Court voir dire and see if it's necessary, but I think at this point, since we have alternates, we don't have to hold them up right now. We can wait until there's a break and do that. But I think that is something that at some point for purposes of the record will have to be addressed." (Id. at 166-167).
 {¶ 57} On the morning of the fourth day of trial, the court noted that it needed to speak to "the one individual" in camera and asked the defense if it would be ready to begin its case thereafter. The court estimated that it needed five minutes to address the matter. (Tr. Vol. IV at 28). A recess was taken, and then the court came back on the record stating:
 {¶ 58} "I spoke with Sandra Reynolds and she indicates that she is familiar generally with some people that are connected to this case. She didn't realize the connection until we had got into the testimony — And her brief conversations were only meant to validate those connections. She further assured me not once, but twice, that those things would not in any way interfere with her ability to serve fairly for both sides. I was quite satisfied with the fact that she answered my questions directly and she seemed very comfortable. And my opinion is that she should be permitted to stay on the jury. Any of you have any —
 {¶ 59} "[The state]: No, Your Honor.
 {¶ 60} "[The defense]: No objection." (Id. at 28-29).
 {¶ 61} On appeal, appellant complains that the court interviewed the juror but never interviewed Mrs. Coffman. Appellant also argues that his right to be present at the voir dire of this juror was violated, claiming that his presence would have caused the juror to more closely consider her responses. Additionally, he claims that the court's inquiry of the juror was insufficient and contained leading questions. He *Page 15 
alleges that the court's questioning failed to overcome the presumption of prejudice that arose as a result of the juror's contact with a witness's mother, citing Remmer v. United States (1954), 347 U.S. 227. In his sixth assignment of error, he contends that counsel was ineffective for failing to participate in the in camera voir dire, for failing to request that the court interview Mrs. Coffman and for allowing the juror to remain on the panel.
 {¶ 62} The state responds by pointing out that appellant is the one who requested the court to voir dire the juror at some point in the future, appellant was forewarned immediately before the court entered its chambers with the juror, and appellant had no objection to the juror remaining on the panel thereafter. The state then notes that waiver of the right to be present need not be express and that any error can be harmless. As for the ineffective assistance argument, the state points out that this was a trial tactic, as the juror was already approved by the defense and Mrs. Coffman's status as appellant's aunt may have worked in appellant's favor.
 {¶ 63} This issue revolves around the following constitutional provision: "In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel." Section 10, Article I of the Ohio Constitution. A criminal defendant thus has a fundamental right to be present at all critical stages of his trial, absent a waiver of rights or other extraordinary circumstances.State v. Williams (1998), 82 Ohio St.3d 16, 26; State v. Hill (1995),73 Ohio St.3d 433, 444. In implementing this right, Crim.R. 43 provides in pertinent part: "The defendant shall be present at the arraignment and every stage of the trial, including the impaneling of the jury, the return of the verdict, and the imposition of sentence, except as otherwise provided by these rules." As such, the defendant has the right to be present when the court communicates with the jury. State v.Abrams (1974), 39 Ohio St.2d 53, 55-56.
 {¶ 64} However, waiver of an ex parte communication occurs when the judge advises the parties of his intended action and the parties do not object. See State v. Jenkins (1984), 15 Ohio St.3d 164, 237. In other words, waiver can be inferred when counsel and appellant fail to object when they are aware of the court's in camera hearings. State v.Green (2000), 90 Ohio St.3d 352, 372. Furthermore, even in the absence of waiver, the defendant's absence from a conversation with a juror is error *Page 16 
only if a fair and just hearing was thwarted by his absence. Snyder v.Massachusetts (1934), 291 U.S. 97, 107-108. See, also, United States v.Gagnon (1985), 470 U.S. 522.
 {¶ 65} Here, counsel and appellant were aware of the situation. Counsel specifically suggested that the court voir dire the juror, did not ask to assist or to be present and did not seek voir dire of the bystander, Mrs. Coffman. Both counsel and appellant were forewarned a day later that the court was about to interview the juror in chambers. Still, no one objected, and counsel specifically answered that he would be ready to begin his defense when the court returned. The court then came back on the record and described, in appellant's presence, the in-chamber interview with the juror. Once again, no one objected to the procedure. Defense counsel then specifically expressed that he had no objection to the juror remaining on the panel. Consequently, appellant's right to be present was waived.
 {¶ 66} Moreover, the failure to object has not been shown to constitute ineffective assistance. That is, the defense strategy to keep this juror, who had some vague connection with a state witness's mother, was not deficient performance, especially where that witness's mother is also appellant's aunt. This is not a case where someone approached the juror with an intent to influence. Rather, the juror ran into a bystander and determined that she was a person the juror knew in the past. The court voiced that it was satisfied with the juror's explanation and ability to deliberate impartially. Counsel's acceptance of that opinion has not been shown to be erroneous.
 {¶ 67} Nor is prejudice apparent in appellant's absence from the in chambers interview. Defense counsel may have strategized that appellant's presence could actually have negatively affected the juror's mindset toward appellant as he would then have been witness to a possible embarrassing investigation into the juror's questionable conduct. Counsel may have similarly wondered if his own presence would have influenced the juror to believe that he caused the court to call her aside for questioning. As aforementioned, debatable trial tactics are not grounds for finding ineffective assistance of trial counsel. SeeTibbetts, 92 Ohio St.3d at 166; Carter, 72 Ohio St.3d at 558. In addition, whether an interview of Mrs. Coffman would have been relevant or enlightening to the defense is a fact not on the record before us. *Page 17 
 {¶ 68} As for the sufficiency of the court's inquiry, we have reviewed the transcript of the court's in camera voir dire. The juror explained that she worked with, but is not a friend of Mrs. Coffman and that she hardly recognized her when she ran into her outside the courtroom. She affirmatively answered that she could assure the court that she can be fair and impartial. (Tr. 2-3). Although the court could have gone into more detail with the facts or with her ability to put aside any connection with Mrs. Coffman, the court's voir dire is not per se insufficient. The main issue for the trial court was whether the juror attested that she could be fair and impartial considering her realization that she knows the mother of a state's witness (who is also appellant's aunt). See, e.g., R.C. 2313.42(J). This question was answered to the trial court's satisfaction, and we do not find the trial court's decision unreasonable, arbitrary or unconscionable. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 69} Appellant's third assignment of error provides:
 {¶ 70} "THE TRIAL COURT ERRED IN SUMMONING TALESMEN WITHOUT ISSUING A VENIRE TO THE SHERIFF AS REQUIRED BY R.C. 2313.39, WITHOUT A RETURN OF VENIRE HAVING BEEN FILED BY THE SHERIFF AND WITHOUT SAFEGUARDS TO INSURE THAT THE TALESMEN WERE FAIRLY, RANDOMLY AND IMPARTIALLY SELECTED."
 {¶ 71} It has generally been stated that talesmen are "jurors returned from bystanders or the body of the county to complete a panel when because of challenge or other cause, there is not a petit jury to determine a civil or criminal case." State v. Stukey (1973),40 Ohio App.2d 512, 519 (7th Dist)., quoting 47 American Jurisprudence 2d 627, Jury, Section 2. Appellant's argument herein revolves around to two statutes relating to talesmen. The first reads:
 {¶ 72} "When, by reason of challenge or other cause, enough jurors to make up the panel, either of the grand or petit jury, are not present, or if the array is set aside, the sheriff shall summon talesmen until the deficiency is made up." R.C. 2313.38
 {¶ 73} The next statute then provides:
 {¶ 74} "When it is necessary to summon talesmen, the court, on the motion of either party, shall select them, and immediately issue a venire for as many persons *Page 18 
having the qualifications of a juror as, in the opinion of the court, are necessary, which persons shall appear forthwith, or at such times as fixed by the court. No person known to be in or about the courthouse shall be selected without the consent of both parties." R.C. 2313.39
 {¶ 75} Before delving into appellant's arguments here, we shall set forth the background of the case concerning the summoning and selection of the talesmen. During jury selection, the court and counsel conferred in an off the record bench discussion. Then, the court took a break stating to the jurors:
 {¶ 76} "We're running a little short of jurors, and the sheriff, when that happens, goes out in the street and gathers up people. * * * I think you can have some empathy for those people who are being pulled out of restrooms now and summoned for jury duty." (Tr. Vol. I at 124-125).
 {¶ 77} Later, another off the record bench discussion was held, apparently regarding the shortage of venirepeople. The court then announced: "Ladies and gentlemen of the jury, we have some other jurors on the way. I explained to you the process; the Sheriff is out seeking people to serve * * *." (Id. at 159). After a break, the court stated: "Ladies and gentlemen, who have been summoned here by the sheriff to help us fill the panel, we're in the process of selecting a jury, and we ran short. So the law says that then we request the sheriff to summon other individuals. * * *" (Id. at 162).
 {¶ 78} The court then noted that the parties had settled on eleven jurors, who were at lunch at the time. The first additional juror was questioned and accepted by the parties as the twelfth juror. She stated that she was summoned while she was at work as a cashier at Morgan's Drugstore where she has worked for four years. (Id. at 171). She disclosed that she is a twenty-year-old college student, who has lived in Leetonia for the past seventeen years. (Id. at 170, 172). She denied that she was acquainted with any law enforcement officers. (Id. at 175).
 {¶ 79} The first alternate stated that he lives in Guilford Lake and has been a resident of Columbiana County his entire twenty-fours years. (Id. at 193). He works at Bill's True Value, said to be right across the square. (Id. at 194). The second alternate chosen stated that he is an architect who lives in East Liverpool. (Id. at 202). *Page 19 
Upon seating the twelfth juror and the two alternates from the talesmen, the court then made the following comments:
 {¶ 80} "My chore at this time is to thank those of you who appeared here this morning. And we do appreciate it, and looking around, it seems that Wellsville is very well represented here, which tells me that Deputy Bianco was on a telephone. And so we do thank you very much and we don't mean to inconvenience you. And don't hold him responsible; you can hold us responsible.
 {¶ 81} "But that's the job that the sheriff's office has. They don't oftentimes get a lot of notice. We had a lot of people excused. I think I counted 11, for numerous solid reasons, this morning, and that's a little unusual to have that many. But they had valid reasons why they couldn't serve, and that's what put us into this circumstance * * *." (Id. at 205-206).
 {¶ 82} Appellant claims that the summoning of the talesmen was invalid because there is no evidence that the court issued a venire to the Sheriff or that the Sheriff filed a return. Appellant then states that the record suggests that the talesmen were selected from in and about Lisbon Square, which is the location of the courthouse. He further states that the record suggests that the choosing of the talesmen was not random and that from the court's comments, it appears the deputy called his friends and family to appear. Appellant also complains that there was no effort placed on the record to determine whether the talesmen were even qualified to serve as jurors, which effort should have included a discussion on whether they are (1) certified as an elector or (2) eighteen, a resident of the county, eligible to be an elector and in possession of a valid driver's license. See R.C. 2313.42.
 {¶ 83} In the absence of a clear showing to the contrary, it will be presumed that the proceedings, including the summoning of talesmen, have been conducted regularly and lawfully. Bobbit v. Maher Bev. Co. (1949),152 Ohio St. 246, 249. This court has further held:
 {¶ 84} "the proper time to object to the qualifications of the last juror was at the impaneling of the jury, and it must be taken as waived unless the party is able to show to the court that with the exercise of reasonable diligence he could not have taken the *Page 20 
exception at the proper time. Cottman v. Federman Co., 71 Ohio App. 89, at page 99, 47 N.E.2d 1009; 32 Ohio Jurisprudence 2d 642-643, Jury, Section 53.
 {¶ 85} "Where the record shows that the party complaining had a fair trial by an impartial jury, the provisions of R.C. 2313.39 may be waived by conduct of counsel. State ex rel. LeGere, v. Carros, 80 Ohio App. 65,74 N.E.2d 779.
 {¶ 86} "The record does not contain anything that would indicate that the selection and summons of the last juror was contrary to statute. However, we feel that defendant was entitled to know how the three prospective jurors were selected and particularly who called them, and that the trial judge committed error in preventing defense counsel from obtaining such information. We further feel that defense counsel waived this error when he indicated that he was satisfied with the jury and proceeded with the trial, and that defendant had a fair trial with an impartial jury." State v. Stukey (1973), 40 Ohio App.2d 512, 520 (7th Dist.).
 {¶ 87} Here, only one talesman ended up deliberating on appellant's case. From all indications, she was qualified as a juror. She was twenty, she worked, she attended Youngstown State University, and she lived in Leetonia, where she has resided most of her life. Moreover, in the absence of a showing to the contrary, we are to presume that only qualified jurors were approached to serve. In the absence of evidence to the contrary, it could even be assumed the twelfth juror was on the annual jury list compiled by the jury commissioner and this is why she was approached at work. Notably, the regular jurors are not typically questioned in voir dire on their qualifications; rather, they are prescreened as qualified by others in the position to verify such matters.
 {¶ 88} Contrary to appellant's suggestion, the record established that the twelfth juror was not a friend or family member of the deputy mentioned (seemingly jokingly); nor was she acquainted with any law enforcement officers. Likewise, the record shows that neither this juror nor the two alternates were from Wellsville, which is the city the court linked to the deputy. In fact, the court's comment on Wellsville suggests that the court and parties had before them paperwork concerning each juror's residency and status as a qualified juror. *Page 21 
 {¶ 89} The record does not establish where Morgan's Drugstore is located in order to address appellant's argument that the square in Lisbon is prohibited grounds for drawing the talesmen. For purposes of this and many other arguments herein, we must point out that this court can only review the record before us in a direct appeal. Regardless, the "in or about the courthouse" language in R.C. 2313.39 does not apply to the entire town square of the county seat.
 {¶ 90} Furthermore, a person can in fact statutorily be selected from "in or about the courthouse" with the consent of both parties. R.C.2313.39. Appellant's actions and omissions during voir dire would constitute such consent. Along these same lines, appellant did not object below to the summoning, the voir dire or the impaneling of the talesmen below. In fact, various discussions on this matter were held off the record. For all we know, defense counsel specifically conceded the validity of the court's proposed proceedings and participated in their very formulation.
 {¶ 91} Consequently, we hold that appellant assented to the procedure used herein. Such a holding is well-supported in both binding and persuasive precedent. See Stukey, 40 Ohio App.2d at 520. See, also,State v. Hanna (Dec. 31, 2001), 12th Dist. No. CA2001-04-032 ("[a] defendant cannot be satisfied with a juror [at the time the jury is impaneled] * * * and then be heard to say after conviction that he is not then satisfied. One may not play fast and loose in this fashion."), quoting Fry v. State (1932), 43 Ohio App. 154, 156; State v. Novak (Mar. 11, 1991), 4th Dist. No. 90CA3 (relying on Stukey); State ex rel. LeGerev. Carros (1946), 80 Ohio App. 65, 68-69 (holding that the procedural steps for the securing of talesmen were waived by counsel and that the record does not show invalidity). This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER FOUR {¶ 92} Appellant's fourth assignment of error provides:
 {¶ 93} "THE TRIAL COURT ERRED IN ADMITTING STATE'S EXHIBIT 40, THE REPORT OF AUTOPSY OF DR. STAN F. SELGIMAN, AND IN PERMITTING THE COLUMBIANA CORONER, DR. GRAHAM, TO TESTIFY AS TO THE REPORT OF AUTOPSY BECAUSE THE REPORT CONSTITUTES TESTIMONIAL] HEARSAY PROHIBITED BYCRAWFORD V. WASHINGTON (204)." *Page 22 
 {¶ 94} An autopsy report was prepared by Dr. Seligman of the Cuyahoga County Coroner's Office. Dr. Seligman did not testify, but Columbiana County Coroner, Dr. Graham, testified instead. He is a medical doctor trained as a pathologist. (Tr. Vol. III at 321). He stated that upon learning of the victim's death, he sent an investigator to the crime scene who examined the body, took photographs and arranged to have the body transported to Cuyahoga County for a forensic autopsy. (Id. at 324). He explained that his office has a contract with the Cuyahoga County Coroner's Office to perform forensic autopsies. (Id. at 327). Dr. Graham testified that he received the autopsy report and autopsy photographs from Cuyahoga County in the regular course of business. (Id. at 328).
 {¶ 95} He testified to defensive wounds on the victim's hands and arms. (Id. at 332, 340). He noted the suffering of a tremendous blow to the kidney. (Tr. 333). The victim's face sustained wounds at the center of the forehead, two broken orbital plates, a fractured nasal septum and wounds around the mouth. (Id. at 334-335). He disclosed that the right side of the victim's face received the most extreme trauma whereas the left side of his face received lighter trauma. (Id. at 342). Dr. Graham found obvious trauma to the brain and injury to the spinal cord. (Id. at 344). He testified that there was no injury to the back of the victim's head (where appellant's statement seemed to place the first blow struck by Forrester). (Id. at 354). He pointed out multiple blows inconsistent with appellant's story that Forrester only hit the victim one or two times and kicked him once. (Id. at 354). Dr. Graham disclosed that just before death, a victim engages in agonal breathing which could be confused with snoring (as described by Forrester's testimony). (Id. at 347-348).
 {¶ 96} Dr. Graham explained that cause of death entails the physiological factors that cause a body to cease to function. (Id. at 322-323). He differentiated this concept from the manner of death, which he places on a death certificate after choosing from natural, accidental, homicide, suicide, under investigation or undetermined. (Id. at 323). He said that he used the conclusion of his agent, Dr. Seligman, to conclude that the cause of death was multiple blunt impacts to head, trunk and upper extremities with skeletal and visceral injuries. (Id. at 354-355). Dr. Graham identified the death certificate and testified that he determined the manner of *Page 23 
death was a homicide. (Id. at 355). He noted that the victim's coronary arteries were in bad shape constituting atherosclerosis and that he also had myocardial fibrosis. (Id. at 344, 348-349). He admitted that this severe heart disease may have also caused the victim's death. (Id. at 353, 396).
 {¶ 97} Appellant had objected to the admissibility of the autopsy report in the absence of Dr. Seligman and to the testimony of Dr. Graham concerning the report. (Tr. Vol. III at 159-164, 356-357; Vol. IV at 18-20). The state urged that Dr. Graham utilized the autopsy report, a business record, to come to his own conclusion on the death certificate. (Id. at 162). The court allowed the testimony of Dr. Graham and the admission of the autopsy report.
 {¶ 98} Appellant claims that the report is testimonial in nature and thus is inadmissible hearsay where the declarant failed to testify. If the report is ruled non-testimonial, appellant alternatively argues that the state failed to qualify it as a business record, alleging that there was no foundation laid by a custodian or other qualified witness. Appellant also argues that Dr. Graham did not independently determine the victim's cause of death.
 {¶ 99} The United States Supreme Court has held that testimonial statements implicate the Confrontation Clause but left it to the states to promulgate rules to determine the admissibility of non-testimonial hearsay. Crawford v. Washington (2004), 541 U.S. 36, 68 (disallowing tape of defendant's wife's statement to police). The Ohio Supreme Court then ruled on a case where a county medical examiner was permitted to testify about an autopsy performed by the retired chief deputy coroner and where that autopsy was admitted into evidence. State v. Craig,110 Ohio St.3d 306, 319, 2006-Ohio-4571. The medical examiner described the examination, the injuries and the test performed, identified photographs taken during autopsy and provided her expert opinion on the cause of death.
 {¶ 100} The Court found that the trial court did not abuse its discretion in permitting the medical examiner to testify as an expert. Id. at 319-320, citing Evid.R. 703. The Court noted that an expert witness is not barred merely because a more qualified or better acquainted expert might be available. Id. at 320. The Court concluded that the testimony did not deny the defendant his right to confrontation, *Page 24 
noting that the jury was aware the medical examiner had not been present at the autopsy. Id., citing State v. Boyd (May 28, 1992), 8th Dist. No. 60639 (where coroner testified even though deputy coroner conducted autopsy).
 {¶ 101} The Court further held that the autopsy report was admissible as a public record and a business record. Id., citing R.C. 313.10
(providing that certified records of coroner are public records and shall be received as evidence in any court) and Evid.R. 803(6). The Court then set out to address whether an autopsy report is testimonial or non-testimonial under Crawford. Id. 320-321 (noting thatCrawford indicated that business records are by their nature not testimonial).
 {¶ 102} The Craig Court determined that an autopsy report is not testimonial in nature because it is prepared in the ordinary course of regularly conducted business and is by its nature not prepared for litigation. Id. at 321, citing People v. Durio (2005), 794 N.Y.S.2d 863. The Court explained the majority position that autopsy reports are admissible as non-testimonial business or public records. Id. The Court also reviewed differing views on whether objective factual findings should be distinguished from opinion and conclusions in the autopsy report. Id. at 321-322. The Court decided, however, that Ohio would adopt the majority position that autopsy reports are admissible as non-testimonial business records. Id. at 322. Thus, the Court reiterated that the medical examiner's testimony about the autopsy findings and her opinion on cause of death did not violate the defendant's confrontation rights under Crawford. Id.
 {¶ 103} Appellant argues that Craig is no longer wholly valid because six weeks after its release, the Ohio Supreme Court adopted an "objective witness" test, which means that a statement is testimonial if it was made under circumstances which would lead an objective witness to reasonably believe that the statement would be available for use at a later trial. State v. Stahl, 111 Ohio St.3d 186, 2006-Ohio-5482, ¶ 36. However, that case dealt with a statement made to a medical professional by a rape victim identifying her attacker and recorded by police as part of their investigation. Accordingly, the Supreme Court was dealing with a situation where the declarant was not making a record, others were. Further, Stahl focused its review on various cases involving statements made during the police investigation. *Page 25 
 {¶ 104} We also note that notwithstanding the objective witness test, the statement in Stahl was still held to be non-testimonial even though it was made in front of a police officer during administration of a rape kit. Stahl did not change the unanimous opinion rendered just weeks before in Craig that an autopsy report made pursuant to the duties of the coroner's office is non-testimonial. Craig still stands for the proposition that an autopsy is a business record, is not hearsay, and does not violate any right to confront the maker of that record. As such, we hold that the trial court did not abuse its discretion in admitting the autopsy report and the testimony of Dr. Graham concerning that report and concerning his expert opinion on the cause and manner of death.
 {¶ 105} We now address the allegations that a proper foundation was not laid to authenticate the autopsy report. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). Among other methods, a witness with knowledge can testify that a matter is what it is claimed to be. Evid.R. 902(B)(1).
 {¶ 106} A business record is admissible if authenticated by testimony of a custodian or other qualified person. Evid.R. 803(6). This does not require the witness providing the foundation to have first-hand knowledge of the making of the record. State v. Wallace, 7th Dist. No. 05MA172, 2007-Ohio-3184, ¶ 21 (customer service assistant at BMV permitted to lay foundation for driving record regardless of whether he is "keeper of records"); State v. Scurti, 153 Ohio App.3d 183,2003-Ohio-3286 (7th Dist.) Rather, it must only be established that the witness is sufficiently familiar with the operation of the business and the circumstances of preparation, maintenance and retrieval that he can reasonably testify on the basis of this knowledge that the record is what it purports to be and that it was made in the ordinary course of business as per the elements of Evid.R. 803(6). Id. Those other elements are: a record made at or near the time by a person with knowledge if it was kept in the course of regular business activity and it was the regular practice to make the record. Evid.R. 803(6).
 {¶ 107} The elements of a business record were established here. Dr. Graham testified that he regularly uses the Cuyahoga County Coroner as its agent to perform *Page 26 
autopsies and generate the paperwork associated therewith. The source of the report is not disputed to be a person with knowledge as the person who performed the autopsy was the one who wrote the report.
 {¶ 108} The photographs and measurements were taken during autopsy. The information in the autopsy report was obviously recorded during the autopsy; that Columbiana County may not have received a typed final copy until "several months" later does not make the information already recorded somehow fall outside the "at or near" the time of the autopsy requirement. See Evid.R. 803(6) ("report, record, or data compilation,in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge").
 {¶ 109} Finally, Dr. Graham has knowledge of the process of reporting and knows how the report was transmitted to his office. Specifically, he stated that he received the autopsy from the Cuyahoga County Coroner's office for his handling in the regular course of his business and that he used the autopsy report in the regular course of his business to aid him in determining the cause of death. He also possesses a duty to maintain the report as a public and business record. See, e.g., R.C.313.10.
 {¶ 110} Furthermore, it has been held that an exhibit can be admitted as a business record of an entity, even when that entity was not the maker of the record. Great Seneca Financial v. Felty, 1st Dist. No. C-050929, 2006-Ohio-6618, ¶ 14 (where one entity relied on records of other entity to arrive at figures). Regardless, since the autopsy record was prepared by the contractual agent of the Columbiana County Coroner for the use and maintenance of said coroner, it can be considered to have in fact been prepared by the Columbiana County Coroner's Office itself.
 {¶ 111} We also note the relevant elements of the hearsay exception for public records: reports of a public office setting forth the activities of the office or setting forth matters observed pursuant to duty imposed by law as to which matters there was a duty to report, unless the sources of information or other circumstances indicate lack of trustworthiness. Evid.R. 803(8). Here, nothing indicates a lack of trustworthiness. It is undisputed that an autopsy is a report of a public office. Finally, the report sets forth the activities of the coroner's office (and its agent) concerning performance of an *Page 27 
autopsy and matters observed during that autopsy, which (once performed) the coroner has the duty to report and disclose.
 {¶ 112} Although the public record here is not self-authenticating because it is not a certified copy as was the death certificate, this does not mean that it cannot otherwise be authenticated. See Evid.R. 902(4). See, also, R.C. 313.10. The coroner of the county which had the obligation to keep the record public testified that it is what it purports to be. See Evid.R. 901(A), (B)(1), (7). Just because another county coroner generated the record as the agent of this county coroner does not make the record any less of a public record (or any less of a business record for that matter). See R.C. 313.10 (autopsy report public record). For all of these reasons, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER FIVE {¶ 113} Appellant's fifth assignment of error contends:
 {¶ 114} "THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF INVOLUNTARY MANSLAUGHTER."
 {¶ 115} Appellant was charged with felony murder due to the allegations that he proximately caused the victim's death in the course of attempting or committing an offense of violence that is a felony of the first or second degree. R.C. 2093.02(B). The underlying felony alleged was felonious assault and/or aggravated robbery. Felonious assault requires knowingly causing serious physical harm to another. R.C. 2903.11 (A)(1). Aggravated robbery involves inflicting or attempting to inflict serious physical harm in attempting or committing a theft offense or in fleeing immediately thereafter. R.C.2911.01(A)(3).
 {¶ 116} Appellant asked for jury instructions on involuntary manslaughter. Involuntary manslaughter can be committed by causing a death as a proximate result of committing or attempting to commit a felony. R.C. 2903.04(A) (a first degree felony). It can also be committed by causing death as a proximate result of committing or attempting to commit a misdemeanor. R.C. 2903.04(B) (a third degree felony).
 {¶ 117} However, appellant sought only the involuntary manslaughterinstruction involving the commission of a misdemeanor. Specifically, he wished the jury to consider whether he caused the death of the victim as a proximate result of *Page 28 
committing or attempting to commit a theft of less than five hundred dollars. (Proposed Jury Instructions, Sept. 16, 2004).
 {¶ 118} On appeal, he notes that the murder charge required an intent to cause serious physical harm. Since he claimed that he lacked this intent and that he only had an intent to commit a simple theft, he urges that the court should have instructed on involuntary manslaughter.
 {¶ 119} The state counters that appellant's version of the events completely places the proximate cause for the death on Forrester. The state concludes that if a jury believed appellant and had been instructed as requested, then he would have been acquitted of both murder and involuntary manslaughter. Thus, they urge that the test for instructing on a lesser offense has not been met.
 {¶ 120} A jury instruction on a lesser included or an inferior degree offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense. State v. Shane (1992),63 Ohio St.3d 630, 632; State v. Thomas (1998), 40 Ohio St.3d 213, 216. In making this determination, the court must view the evidence in a light most favorable to defendant. State v. Smith (2000), 89 Ohio St.3d 323,331. Nonetheless, an instruction is not warranted every time any evidence is presented on a lesser included or inferior degree offense. Rather, there must be "sufficient evidence" to allow the jury to reasonably reject the greater offense and find the defendant guilty on a lesser included or inferior degree offense. Shane,63 Ohio St.3d at 632-633.
 {¶ 121} Here, under appellant's recitation of the facts in his statement and in his testimony at trial, he did not merely attempt to commit a misdemeanor theft. Rather, he admitted that after Forrester hit the victim one or two times and after the victim was knocked to the ground, he grabbed the victim's shoulder with the intent to steal his money. This is more than simple theft. Robbery includes the use of force against another while committing or attempting to commit a theft. R.C.2911.02(A)(3).
 {¶ 122} The statutory definition of force includes any compulsion or constraint physically exerted by any means. R.C. 2901.01(A)(1). Appellant's conceded act of grabbing the victim was thus sufficient force for robbery. In any event, appellant's *Page 29 
admitted attempt to continue the theft even after his complicitor in the theft escalated the offense to assault makes appellant complicit to at least those first punches, which would also constitute the offense of robbery.
 {¶ 123} The type of robbery defined in the aforecited R.C.2911.02(A)(3) is a third degree felony. R.C. 2911.02(B). However, appellant did not request a jury instruction on involuntary manslaughter as a proximate cause of committing a felony. Rather, as aforementioned,he specifically only sought a jury instruction on the type ofinvoluntary manslaughter committed as a proximate cause of committingthe misdemeanor of theft under $500. And, this is all he argues on appeal as well. Thus, regardless of the state's appellate argument, appellant's argument is without merit for the reason expressed herein. As such, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER SIX {¶ 124} Appellant's sixth assignment of error provides:
 {¶ 125} "THE DEFENDANT/APPELLANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO PARTICIPATE IN THE IN-CAMERA VOIR DIRE OF JUROR SANDRA REYNOLDS."
 {¶ 126} Appellant sets forth two different allegations of ineffective assistance of counsel here. One regarding the juror who knew Mrs. Coffman, and one regarding the lack of objection during the investigator's testimony about his belief that appellant's statement was not truthful. Both of these contentions of ineffective assistance were disposed of above within assignments of error numbers one and two, where appellant raised trial court error on the same subjects. This assignment of error is thus overruled.
 {¶ 127} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
 Donofrio, J., concurs. Waite, J., concurs. *Page 1