OPINION
{¶ 1} Defendant-appellant/cross-appellee, Kim Hoover-Moore, appeals from a judgment of the Franklin County Court of Common Pleas finding her guilty of one count of murder, two counts of endangering children, one count of felonious assault, and one count of involuntary manslaughter. Because the trial court committed no reversible error in defendant's convictions, we affirm those convictions, but we remand for resentencing.
 {¶ 2} On December 30, 2002, defendant was indicted on one count of murder in violation of R.C. 2903.02(B); the underlying felony offense of violence was endangering children under R.C.2919.22(B)(1) or felonious assault under R.C. 2903.11. She further was indicted on one count of endangering children in violation of R.C. 2919.22(B)(1), one count of felonious assault in violation of R.C. 2903.11, one count of involuntary manslaughter in violation of R.C. 2903.04, and one count of endangering children in violation of R.C. 2919.22(A). The charges arose out of an incident on November 29, 2002, in which an infant, Samaisha Benson, sustained fatal injuries during the time she was under defendant's care.
 {¶ 3} Samaisha Benson was born on February 14, 2002; her older sister, Dorica Benson, was born on March 7, 2001. Because the girls' parents, Akila and Wendo Benson, both worked outside the home, the parents arranged for defendant to provide day care services for both girls in her home.
 {¶ 4} On November 29, 2002, Wendo took Dorica and Samaisha to defendant's residence at approximately 3:00 p.m. Defendant's 13-year-old son, as well as three other children defendant cared for, were at the house when Wendo arrived with the girls. At 6:39 p.m., a 9-1-1 call was placed from defendant's home. Christopher Hiles and Keith Windle, firefighters and paramedics with the city of Columbus, were dispatched to the scene. When they entered defendant's home at approximately 6:45 p.m., they observed an infant lying on the floor, experiencing breathing difficulties. Defendant, who was kneeling next to the baby, told Hiles the infant was "not quite feeling right." (Tr. Vol. II, 224.) Hiles picked up the child and noted she was unresponsive and "lifeless." (Id.) Hiles intubated Samaisha and immediately transported her to Children's Hospital. Suspicious of defendant's calm demeanor, Hiles reported the incident to the police.
 {¶ 5} Dr. Ellen McManus, an emergency room physician at Children's Hospital, treated Samaisha on the date of the incident. According to Dr. McManus, when Samaisha first arrived at the hospital, she was experiencing "posturing," a stretching of the muscles indicative of increased pressure in the brain. "Her arms were stretched out, her legs were stretched out, her head was stiff, and she was not moving and not breathing and appeared to be in respiratory failure." (Tr. Vol. II, 362.) Dr. McManus recognized that the type of posturing Samaisha exhibited usually indicates a head injury. According to Dr. McManus, Samaisha's condition upon arrival at the hospital was "extremely critical, very close to dying." (Tr. Vol. II, 363.)
 {¶ 6} Dr. McManus ordered a CT scan of Samaisha's head, which revealed a skull fracture on the left posterior portion of the head. In addition, the scan depicted a subdural hematoma, which is a "collection of blood between the most exterior surface of the brain called the dura and the brain tissue itself." Lastly, the procedure exposed retinal hemorrhages, where, as a result of vigorous shaking, "blood vessels at the back of the eye are torn and bleeds [sic] under the covering of the back of the eye called the retina." (Tr. Vol. II, 363, 366.)
 {¶ 7} After further testing was completed, it was determined that Samaisha suffered from "shaken baby impact syndrome," a sub-category of "shaken baby syndrome." According to Dr. McManus, "shaken baby syndrome" occurs "where a child, usually a small infant * * * is violently shaken and their head swings back and forth. The brain tends to bounce around inside the skull causing very tiny blood vessels that help the brain, feed the brain, get torn off and the blood starts to kind of pool around the brain itself, which causes pressure on the brain and can eventually kill the baby." (Tr. Vol. II, 365.) Dr. McManus described "shaken baby impact syndrome" as "essentially the same thing, violently shaking, but at some point the head actually impacts a hard surface and sustains a fracture." (Id.) Samaisha was eventually transferred to the intensive care unit. A second CT scan taken the next day revealed increased swelling of the brain. Samaisha died as a result of her injuries at 11:15 p.m. on December 1, 2002.
 {¶ 8} At trial, Dr. McManus opined that Samaisha's injuries occurred "within probably minutes" of the 9-1-1 call. (Tr. Vol. II, 367.) Dr. McManus based her opinion on the fact that Samaisha presented at the hospital unconscious and lifeless. In support of her opinion, she explained that "[b]abies do not have very large reserves. They cannot take that kind of trauma and * * * remain active and alert and do normal things that babies do." (Id.)
 {¶ 9} Dr. McManus prepared a written report of the incident, stating that Samaisha's injuries were consistent with child abuse; however, she did not include in her report her opinion regarding the timing of the injury. When cross-examined at trial regarding that omission, she denied that her opinion was not formulated until well after she assessed the injuries. Dr. McManus also noted in her report that Samaisha's mother related that the baby's father had a history of spousal abuse and had shaken Samaisha's older sibling.
 {¶ 10} Dr. McManus testified that when the baby's mother arrived at the hospital, defendant quickly asked her to "tell the doctor about the baby's father." (Tr. Vol. II, 368.) Dr. McManus averred that defendant's insistence that the mother discuss the baby's father with other hospital personnel seemed "unusual," as if defendant were trying to "make a point." (Id.)
 {¶ 11} Deputy Coroner Dr. Patrick Fardal performed an autopsy on Samaisha on December 2, 2002. The autopsy revealed a skull fracture on the left posterior portion of the head, bruising on the posterior scalp, and several subdural hemorrhages. Dr. Fardal opined the injuries resulted from being struck on the head by an object or having the head struck on an object. The autopsy also revealed several optic nerve and retinal hemorrhages, as well as brain swelling. Dr. Fardal determined the cause of death to be "blunt impact to her head with the resulting fractures of the skull and subdural hemorrhages." (Tr. Vol. III, 396.) He testified that the retinal and optic nerve hemorrhages suggested the infant had also been shaken.
 {¶ 12} On cross-examination, Dr. Fardal testified that the actual cause of death was swelling of the brain and not the skull fracture itself. He further testified that swelling of the brain can occur over a period of time, and that the initial symptoms are lethargy, sleepiness and difficulty breathing. If, however, the traumatic event is so severe that the force is transmitted to the brain itself, the period of lucidity is contracted to near the time of injury. In other words, a severe impact to the skull could cause incapacity within minutes, rather than hours.
 {¶ 13} Dr. Charles Johnson, a professor of pediatrics at the Ohio State University and a member of the child abuse team at Children's Hospital, testified as an expert in the area of pediatrics and child abuse. Dr. Johnson described the general physiology of both "shaken baby syndrome" and "shaken baby impact syndrome" in significant detail. Regarding the instant case, Dr. Johnson testified he neither treated nor examined Samaisha while she was in the hospital. Rather, he became involved in the case only after Samaisha's death when, on December 6, 2002, he chaired a committee charged with reviewing information regarding the circumstances of Samaisha's death. The committee consisted of Dr. Johnson, a Columbus police detective, a Franklin County Children Services caseworker, and a medical student.
 {¶ 14} As a member of the committee, Dr. Johnson reviewed several documents, including the emergency medical services report, the emergency room report, the summaries of interviews police conducted with Samaisha's mother, Samaisha's father, defendant, and defendant's son, the CT scans taken of Samaisha's head, and the preliminary results of the autopsy. From this information, Dr. Johnson constructed a time line depicting the sequence of events leading to Samaisha's death. The time line included observations of paramedics and emergency room personnel as to Samaisha's physical condition, and it delineated those persons involved in Samaisha's care-taking during relevant periods of time.
 {¶ 15} Based on the documentation reviewed, Dr. Johnson determined that Samaisha was acting normally at 1:00 p.m. on November 29, 2002. At 3:00 p.m. she was left in defendant's care; her condition at that time was reported as sleepy, asleep, fussy and active. At some point during the day, she became fussy; she was quieted and then fell asleep. At 6:39 p.m., paramedics found her limp with troubled breathing; she required resuscitation. She presented to the hospital with several retinal hemorrhages.
 {¶ 16} Based solely on information compiled from the sources noted above, Dr. Johnson opined that Samaisha suffered her head injury "[w]ithin minutes prior to the squad being called." (Tr. Vol. III, 456.) In support of his opinion, Dr. Johnson stated, "[b]ecause this baby's condition was such that when the squad arrived, and from the description by the babysitter of needing mouth-to-mouth resuscitation, that the baby's condition had gone from what appeared to be slightly sleepy or calming when picked up, then sleeping normally for a time period, no evidence that this baby is moving downhill into unconsciousness, that something must have happened immediately prior to this baby having trouble with its breathing and requiring resuscitation, a matter of minutes." (Tr. Vol. III, 456-457.) Dr. Johnson further opined that it was "highly unlikely" that Samaisha would still be alive at 6:39 p.m. if she had been shaken and impacted before 3:00 p.m. (Tr. Vol. III, 486.)
 {¶ 17} Akila Benson, Samaisha's mother, testified she met Wendo, a citizen of Tanzania, in 1999. At the time, Wendo was in the United States on a visa. The two married in 2000. As the spouse of an American citizen, Wendo was permitted to remain in the United States after his visa expired. At some point, Akila and Wendo began having marital problems, which on at least one occasion escalated to physical violence. Specifically, in January 2002, Akila, who was seven months pregnant, reported to police that Wendo shook her repeatedly during an argument. They ultimately agreed to separate, and Akila made plans to move into a separate residence on December 1, 2002.
 {¶ 18} Akila testified there was nothing unusual about Samaisha's behavior on the morning of November 29, 2002. At 11:30 a.m., Akila left for work, leaving Wendo to care for the girls until he had to leave for work at 3:00 p.m. He was then to transport the girls to defendant's home.
 {¶ 19} Sometime in the early evening, defendant telephoned Akila at her workplace and asked her if Wendo had "hurt the baby." (Tr. Vol. II, 279.) When Akila asked what was wrong with Samaisha, defendant responded she "didn't know," but that paramedics were "working on her." (Id.) After the paramedics left with Samaisha, defendant picked up Akila at her workplace and transported her to the hospital. At the hospital, defendant told Akila that Wendo was acting strangely when he dropped Samaisha off at her home. Defendant offered no explanation as to what had happened to Samaisha, other than to report that when she tried to feed Samaisha in the high chair, she "wasn't herself." (Tr. Vol. II, 281.)
 {¶ 20} Later that evening, a Columbus police detective and a hospital social worker interviewed Akila; she reported to them that in May 2001, Wendo, out of frustration, shook three-month-old Dorica because she would not stop crying. She also informed the officer that in the summer of 2002 she initiated proceedings to have Wendo deported. She further reported that Wendo came home intoxicated at 1:00 a.m. on November 29, 2002. At trial, Akila denied that Wendo shook Dorica; rather, she testified that he simply grabbed her arms.
 {¶ 21} Wendo Benson, Samaisha's father, testified that Samaisha was acting normally during the morning and early afternoon hours of November 29, 2002. He took the girls to defendant's house just before 3:00 p.m. He carried Samaisha in her car seat into the house and placed the car seat on a chair. At the time, Samaisha was awake and crying. After defendant reassured Wendo that Samaisha would be fine, he left for work. At approximately 10:00 p.m., two detectives came to his workplace and reported that Samaisha had been seriously injured and was in the hospital in critical condition.
 {¶ 22} Wendo went to the hospital, where two detectives interviewed him. When asked if he knew how Samaisha could have suffered a shaking injury, he offered only that he had driven over some speed bumps on the way to defendant's home and that Dorica sometimes played roughly with Samaisha. Wendo denied ever shaking either Dorica or Samaisha.
 {¶ 23} Thirteen-year-old Ashley Bundy testified that defendant cared for her for two weeks when she was ten years old. During that two-week period, defendant became angry at Ashley and pushed her against a playpen, causing a bruise to her right eye. Ashley further testified she observed defendant angrily and forcefully shake an infant because the infant would not stop crying. Ashley's 10-year-old brother, Ryan Bundy, testified that while he was in defendant's care, defendant banged his head on the ground when he refused to take a nap. None of these incidents were ever reported to police or children services. Sheila Grimes and Ruth Years testified that defendant provided child care services for their respective grandchildren for years without incidence.
 {¶ 24} The videotaped deposition of Dr. Gerald Steinman was played for the jury. Dr. Steinman is a pediatric neurologist at Children's Hospital and a professor of neurology at The Ohio State University. At defendant's request, Dr. Steinman reviewed Samaisha's medical records, as well as the factual history defendant and her son reported as to the sequence of events leading up to the time Samaisha was transported to the hospital. Although Dr. Steinman agreed that Samaisha's death resulted from "shaken baby impact syndrome," he disagreed with Dr. Johnson's conclusion that Samaisha's injuries were incurred immediately prior to the 9-1-1 call. To the contrary, Dr. Steinman opined it was "entirely reasonable to assume that this trauma occurred before the babysitter got the baby." (Tr. of October 22, 2003 videotaped deposition, 12.) Although Dr. Steinman acknowledged the possibility that the injuries could have been incurred only minutes before the 9-1-1 call was made, he nonetheless averred, based particularly on both defendant's and her son's indication that Samaisha was sleepy and irritable when she arrived at defendant's home at 3:15 p.m., that "my timeline is not minutes; my timeline is hours." (Id. at 16.)
 {¶ 25} Defendant testified on her own behalf. In 1997, defendant began providing day care services in her home. Since that time, she has cared for approximately 20 children. At the time she began caring for Samaisha and Dorica in September 2002, she was also caring for six other children in addition to her son.
 {¶ 26} According to defendant, on November 29, 2002, Wendo Benson brought Samaisha and Dorica to defendant's house around 3:00 p.m. Samaisha was still in the car seat; defendant assumed Samaisha had fallen asleep in the car and was still sleeping. Wendo placed the car seat on a chair and left. Defendant left Samaisha in the car seat for about five minutes while she tended to two of the other children. She then took Samaisha from the car seat, removed her snowsuit and hat, and laid her in a portable crib to resume her nap. Since Samaisha was asleep, defendant did not check on her for the next few hours.
 {¶ 27} Sometime between 6:00 and 6:30 p.m., defendant retrieved Samaisha from the crib, carried her to the kitchen, and placed her in the high chair to feed her. As she secured Samaisha in the high chair, she noticed Samaisha was having difficulty holding her head up. Defendant called 9-1-1 and reported that Samaisha was having problems breathing. During the conversation with the 9-1-1 operator, she determined Samaisha was no longer breathing. At the 9-1-1 operator's urging, she placed Samaisha on the floor and began cardiopulmonary resuscitation ("CPR"). Defendant ceased CPR when her son told her he could hear Samaisha breathing. Almost immediately thereafter, two paramedics arrived. One of them picked up Samaisha and took her to the emergency vehicle. Defendant transported Akila to the hospital. While at the hospital, defendant related what had happed to a police detective. On cross-examination, defendant testified that Samaisha was breathing normally both when Wendo brought her to the house at 3:00 p.m. and when she transferred her to the portable crib.
 {¶ 28} Following deliberations, the jury returned a verdict finding defendant guilty of all five counts of the indictment. The trial court merged all five convictions and sentenced defendant on the murder charge.
 {¶ 29} On appeal, defendant assigns the following errors:
1. The trial court committed plain error by permitting Dr. Charles Johnson to testify about his opinion as to the injuries to Samaisha Benson when that opinion was not based upon the foundation required by Evid.R. 703 and Evid.R. 705.
2. The trial court committed plain error by permitting Ellen McManus, M.D. to testify to her conclusion about the timing of the injuries to Samaisha Benson when that conclusion was not based upon the foundation required by Evid.R. 703 and Evid.R. 705.
3. Defense counsel at trial rendered ineffective assistance of counsel under the 6th and 14th Amendments to the United States Constitution, especially by failing to object to the testimony of Dr. Johnson about the injuries to Samaisha Benson and to the testimony of Dr. McManus about the timing of the injuries to Samaisha Benson.
 {¶ 30} The state of Ohio has filed a cross-appeal, assigning a single assignment of error:
1. The trial court acted contrary to law by merging endangering children with murder for purposes of sentencing.
 {¶ 31} For purposes of discussion, we address defendant's first and second assignments of error in reverse order. In the second assignment of error, defendant argues that Dr. McManus's expert opinion lacked the evidentiary foundation required by Evid.R. 703 and 705. With regard to Evid.R. 703, defendant contends Dr. McManus's conclusion regarding the timing of Samaisha's injuries was based on facts or data not perceived by her and not admitted into evidence. Specifically, defendant argues that Dr. McManus's testimony was inadmissible because it was based on a review of CT scans she did not personally perform and which were not admitted into evidence. As to Evid.R. 705, defendant contends the record does not clearly demonstrate the basis for Dr. McManus's opinion.
 {¶ 32} Although defendant concedes that she did not object to Dr. McManus's opinion testimony, defendant contends the court's error in allowing the testimony is cognizable as plain error. In particular, defendant contends that the key to determining who was legally responsible for Samaisha's death lay in isolating the time she was injured. Defendant further contends Dr. McManus's impermissible testimony pinpointing the time of injury as within minutes of the 9-1-1 call severely prejudiced the defense theory that Wendo Benson, consistent with his prior history of shaking both his wife and oldest child and out of frustration borne of his marital difficulties and impending deportation, inflicted the injuries that caused Samaisha's death while he cared for her between 11:30 a.m. and 3:00 p.m. on November 29, 2002.
 {¶ 33} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." This rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial: (1) "there must be an error, i.e., a deviation from a legal rule," (2) the error must be plain, so that it constitutes "an `obvious' defect in the trial proceedings," and (3) the error must have affected "substantial rights" such that "the trial court's error must have affected the outcome of the trial." State v. Barnes
(2002), 94 Ohio St.3d 21, 27. The decision to correct a plain error is discretionary and should be made "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id., quoting State v. Long
(1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 34} Evid.R. 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." In support of her argument, defendant citesState v. Chapin (1981), 67 Ohio St.2d 437, certiorari denied,Chapin v. Marshall, 46 U.S. 1047, 104 S.Ct. 722, and State v.Jones (1984), 9 Ohio St.3d 123, both of which adopted a strict interpretation of Evid.R. 703. In Chapin, the court rejected the expert opinions of four psychiatrists who based their opinions concerning the defendant's mental state on the contents of one or more reports which the psychiatrists did not prepare and were not admitted in evidence. Similarly, the Jones court rejected opinions of three expert witnesses who based their opinions regarding the defendant's mental status in part on reports and medical histories not admitted into evidence and not prepared by the witnesses.
 {¶ 35} As defendant acknowledges, the Ohio Supreme Court adopted a more relaxed interpretation of Evid.R. 703 in State v.Solomon (1991), 59 Ohio St.3d 124. In that case, two physicians who conducted independent psychiatric evaluations of the defendant proffered testimony opining that the defendant was legally insane. The trial court disallowed the testimony because one of the physicians reviewed police reports and hospital records, and the other reviewed the reports of other physicians. Relying on Chapin and Jones, the state contended that the trial court properly struck the testimony because the physicians based their opinions, in part, on reports not in evidence.
 {¶ 36} The Supreme Court rejected the state's argument, distinguishing Chapin on the basis that there was no indication in Chapin that the psychiatrists ever personally examined the defendant. Similarly, it distinguished Jones on grounds that the court in Jones "did not meet or discuss the issue as to whether such testimony is admissible where the doctors have personally examined the defendant and have arrived at their opinions based, in whole or in major part, on their perceptions gained from their direct personal examinations of the defendant."Solomon, at 126. By contrast, the Solomon court noted that both expert witnesses in that case personally examined the defendant and thus "had based their opinions on facts or data perceived by them." Id. Accordingly, the court held at the syllabus that "[w]here an expert bases his opinion, in whole or in major part, on facts or data perceived by him, the requirement of Evid.R. 703 has been satisfied."
 {¶ 37} In State v. Hamilton (Oct. 25, 1996), Clark App. No. 2882, the court applied Solomon to a fact pattern similar to the one presented here. In Hamilton, the defendant contended that, pursuant to Evid.R. 703, a rape victim's treating physician could not testify about the results of various throat culture tests because he did not perform the actual laboratory work and because the test results were not admitted into evidence at trial. The Hamilton court rejected defendant's argument, concluding that the results of the diagnostic tests, "if perceived by an expert during the course of medical treatment, need not be entered in evidence to support the expert's opinion at trial." Rather, the court concluded, where the physician reviewed the test results of the various throat cultures taken during treatment of the patient, the physician's "related opinion was based upon facts and data perceived by him, thus satisfying Evid.R. 703." Id.
 {¶ 38} Following Solomon and Hamilton, this court, inState v. Gulertekin (Dec. 3, 1998), Franklin App. No. 97APA12-1607, appeal not allowed (1999), 85 Ohio St.3d 1455, rejected a defendant's contention that the trial court violated Evid.R. 703 in allowing expert witness testimony of a physician who based her conclusions concerning a victim's injuries upon a review of x-rays and CT scans which were not admitted in evidence and which she did not personally perform. Relying on the fact that the physician personally examined the victim at least three times in her capacity as the victim's "neurological physician," this court concluded that the admission of the physician's testimony "complies with the requirement that the physician based her opinion on `facts or data perceived' by her, even though some of the opinion may have been based on reports not in evidence." Id.
 {¶ 39} Here, defendant concedes the record establishes that Dr. McManus personally treated Samaisha upon her arrival in the emergency room. The record further establishes that Dr. McManus, as the attending emergency room physician, ordered the initial CT scan because Samaisha exhibited symptoms indicative of head trauma. Based upon her examination and a review of the CT scan, Dr. McManus prepared a report of her findings. Although Dr. McManus admitted that her report did not include a finding regarding the timing of the injury, she testified that she immediately "knew that the injury happened quite quickly before the baby was brought into the emergency room." (Tr. Vol. II, 376.)
 {¶ 40} Based upon the interpretation of Evid.R. 703 pronounced in Solomon and followed in Hamilton andGulertekin, we conclude that the admission of Dr. McManus's testimony complies with the requirement that she base her opinion on "facts or data perceived" by her, even though she may have based her opinion, in part, on a CT scan that she did not personally perform and that was not admitted into evidence. While defendant argues that Dr. McManus did not remain Samaisha's treating physician after she was transferred to the intensive care unit, the cases noted above do not support the narrow interpretation defendant suggests.
 {¶ 41} Defendant also contends Dr. McManus did not clearly state the basis of her opinion regarding the timing of Samaisha's injuries, thus violating Evid.R. 705 which states: "[t]he expert may testify in terms of opinion or inference and give his reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise." Following Dr. McManus's lengthy testimony describing Samaisha's condition upon arrival at the hospital and the procedures she employed as Samaisha's treating physician to assess Samaisha's injuries, the prosecution posed the following hypothetical question: "I want you to assume the squad arrived at 6:45 p.m. Considering Samaisha's condition when she was brought into the hospital can you give an opinion as to when the fatal injury occurred?" (Tr. Vol. II, 368-369.) Dr. McManus opined that the fatal injury occurred only minutes before the emergency squad arrived at defendant's home. Contrary to defendant's contention, the record establishes that Dr. McManus clearly specified, before giving her opinion, the underlying facts or events upon which she relied.
 {¶ 42} The requirements of both Evid.R. 703 and 705 were met in this case with regard to Dr. McManus's expert testimony. Accordingly, the admission of Dr. McManus's testimony did not constitute plain error. Defendant's second assignment of error is overruled.
 {¶ 43} Defendant's first assignment of error challenges the admission of Dr. Johnson's expert testimony on grounds similar to those raised in connection with Dr. McManus's testimony. Defendant contends Dr. Johnson based his testimony regarding the timing of Samaisha's injuries on police reports, medical reports, and CT scans that were never placed in evidence. Defendant further argues that the admission of Dr. Johnson's testimony was particularly egregious because Dr. Johnson testified he never personally treated or even examined Samaisha. Even if we were to accept defendant's contention that the court erred in allowing Dr. Johnson's testimony as to the timing of Samaisha's injuries, on the record before us defendant has failed to demonstrate plain error, as Dr. Johnson's testimony was cumulative of that which Dr. McManus provided. Defendant's first assignment of error is overruled.
 {¶ 44} Defendant's third assignment of error asserts she was rendered ineffective assistance of counsel. To demonstrate ineffective assistance of counsel, the defendant must meet a two-part test. Strickland v. Washington (1984), 466 U.S. 668,686, 104 S.Ct. 2052. Initially, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Id. The defendant then must show that counsel's deficient performance prejudiced the defense. Id. This requires showing that but for counsel's unprofessional errors, the result of the trial would have been different. Id. at 694.
 {¶ 45} Defendant asserts her counsel was ineffective in failing to object to the expert testimony both Dr. McManus and Dr. Johnson offered concerning the timing of Samaisha's injuries. Dr. McManus's testimony, however, was admissible, and the admission of Dr. Johnson's testimony was not prejudicial, given that it was cumulative of Dr. McManus's testimony. As such, the failure to object to the admission of the evidence does not constitute ineffective assistance of counsel. Defendant's third assignment of error is overruled.
 {¶ 46} In its cross-appeal, the state contends the trial court erred in merging, for purposes of sentencing, defendant's R.C. 2919.22(B)(1) child endangering conviction with her felony murder conviction under R.C. 2903.02(B).
 {¶ 47} R.C. 2941.25, Ohio's multiple count statute, provides that "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." R.C.2941.25(A). R.C. 2941.25(B) provides that "[w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 48} "Under an R.C. 2941.25(A) analysis, the statutorily defined elements of offenses that are claimed to be of similar import are compared in the abstract." (Emphasis sic.) State v.Rance (1999), 85 Ohio St.3d 632, paragraph one of the syllabus, overruling Newark v. Vazirani (1990), 48 Ohio St.3d 81. "Courts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes `correspond to such a degree that the commission of one crime will result in the commission of the other' * * * [a]nd if the elements do so correspond, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus." Rance, at 638-639. (Citation omitted.)
 {¶ 49} The felony murder statute, R.C. 2903.02(B), provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 [the voluntary manslaughter statute] or section 2903.04 [the involuntary manslaughter statute]." Child endangering is defined in R.C. 2919.22(B)(1), which states that "[n]o person shall do any of the following to a child under eighteen years of age * * *: (1) [a]buse the child[.]"
 {¶ 50} A comparison of the elements of R.C. 2903.02(B) and2919.22(B)(1) in the abstract reveals that the two offenses are not allied offenses because the commission of one will not automatically result in the commission of the other. Here, one of the elements of felony murder is proof of an underlying offense of violence that is a felony of the first or second degree, other than voluntary or involuntary manslaughter. However, the underlying offense of violence need not be child endangering. Further, felony murder requires that a death occur; child endangering does not. By contrast, child endangering requires a victim under 18 years of age; felony murder does not. Consequently, under Rance, the commission of one offense can occur without the commission of the other, and therefore, these offenses are not allied offenses of similar import. Because the trial court erred in merging them, plaintiff's cross-assignment of error is sustained.
 {¶ 51} Having overruled defendant's three assignments of error, but having sustained plaintiff's single assignment of error on cross-appeal, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and the matter is remanded to that court for resentencing.
Judgment affirmed in part and reversed in part; case remandedfor resentencing.
Lazarus, P.J., and Petree, J., concur.