FRY, Appellant,

v.

KING et al., Appellees.

[Cite as *Fry v. King*, 192 Ohio App.3d 692, 2011-Ohio-963.]

Court of Appeals of Ohio,
Second District, Miami County.

No. 2010 CA 12.

Decided March 4, 2011.

James L. Thieman, for appellant.

Paul B. Roderer Jr., for appellee Jack L. King Jr.

Robert M. O'Neal, for appellee Progressive Preferred Insurance Co.

Gregory P. Dunsky, for appellee United States of America.

---

DONOVAN, Judge.

{¶ 1} This matter is before the court on the notice of appeal of Lloyd B. Fry, filed April 2, 2010. On April 7, 2008, Fry filed a complaint against Jack L. King, following a July 4, 2006 collision between Fry's motorcycle and King's vehicle at the intersection of Route 66 and Ziegler Road in Piqua. Fry alleged that King pulled his vehicle into the southbound lane of State Route 66 from Ziegler Road as Fry approached the intersection, requiring Fry to "lay his motorcycle down on the roadway in order to avoid a collision, thereby causing Fry multiple injuries." Fry later amended his complaint to include Progressive Preferred Insurance Company, King's insurer, and Progressive filed a counterclaim against Fry and a cross-claim against King. Fry filed a second amended complaint against the United States, demanding that the United States "set forth its claim in subrogation or for reimbursement for payments made pursuant to the Medicare program for Plaintiff's medical bills" resulting from the collision. King filed a third-party complaint against Joseph Adams and Julie Adams, alleging that they had parked their white SUV along State Route 66 "at a point so close to Ziegler Road as to create an obstruction for motorists using either State Route 66 or Ziegler Road." Julie Adams is Fry's daughter. King later dismissed his claims against Joseph Adams and Julie Adams. A trial to a jury resulted in a verdict in favor of King, and in response to an interrogatory, the jury determined that King was not negligent.

{¶ 2} Fry testified at trial that King pulled into the intersection in front of him. He identified the skid mark left by his motorcycle in a photograph of the scene of the accident, and he estimated that it was 17 to 18 feet in length. Fry further testified that he later measured, using a "wheel," the distance between the beginning of the skid mark and the center line of Ziegler Road, and that the distance was 79 feet. In other words, according to Fry, he was about 79 feet

away from King's vehicle when he began to skid. Fry stated that he was traveling between 40 and 45 miles per hour at the time.

{¶ 3} Marvin Adams, Joseph Adams, who is Marvin's brother, Julie Adams, and Jeremy Adams, Marvin's son, all of whom witnessed the accident, also testified for Fry. Marvin Adams lives at the corner of State Route 66 and Ziegler Road and was hosting a cookout for his family at the time of the accident. Each of Fry's witnesses testified that they observed King's vehicle reverse direction in the course of the accident. They also identified on a scaled drawing of the scene the placement of both vehicles as the accident progressed. Michael and Vicky Tufts, who were present to watch fireworks at a nearby location, and who also witnessed the accident, testified that King did not reverse his vehicle in the manner suggested by Fry's witnesses.

{¶ 4} Fry asserts one assignment of error herein as follows:

{¶ 5} "The trial court committed prejudicial error in permitting the defendant-appellee's expert accident reconstructionist, Henry Lipian, to state his opinions when those opinions were based upon measurements of the scene of the incident that were neither 'perceived by the expert or admitted in evidence at the hearing' as required by Evid. Rule 703."

{¶ 6} " 'In all proceedings involving matters of a scientific, mechanical, professional or other like nature, requiring special study, experience or observation not within the common knowledge of laymen, expert opinion testimony is admissible to aid the court or the jury in arriving at a correct determination of the litigated issue.' " *Huffman v. Stone* (1971), 26 Ohio St.2d 159, 160, 55 O.O.2d 308, 270 N.E.2d 347, quoting *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d 77, 40 O.O.2d 87, 228 N.E.2d 304, paragraph one of the syllabus.

{¶ 7} Foundational requirements for admission of an expert's opinion testimony are set forth in Evid.R. 703 and 705. Evid.R. 703 provides, "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." Evid.R. 705 provides, "The expert may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise."

{¶ 8} "Where an expert bases his opinion, in whole or in major part, on facts or data perceived by him, the requirement of Evid.R. 703 has been satisfied." *State v. Solomon* (1991), 59 Ohio St.3d 124, 570 N.E.2d 1118, syllabus. In *Solomon,* the trial court excluded expert testimony because the experts' opinions were based, in part, on medical and police reports not in evidence. The Supreme Court of Ohio held that the expert testimony should have been admitted because the experts had personally examined the defendant and "thus, had based

their opinions on facts or data perceived by them." Id. at 126. See also *State v. Hoover–Moore*, Franklin App. No. 03AP–1186, 2004-Ohio-5541, 2004 WL 2341691, ¶ 35 ("the Ohio Supreme Court adopted a more relaxed interpretation of Evid.R. 703 in [*Solomon* ]").

{¶ 9} By way of background, Lipian testified that he is board certified in the field of accident reconstruction by the Accreditation Commission of Traffic Accident Reconstruction. According to Lipian, "Accident reconstruction is part science and it's part art. It's a process of looking at the available information and data that comes from, say police agencies, depositions, photographs, * * * analyzing the physical evidence, doing necessary follow-up work on our own to fill in gaps for information that isn't available, and then ultimately once you have enough data and information you determine how the crash occurred. * * * And part of it is basic understanding of physics and mathematics. A lot of it is analyzing the physical evidence, understanding what you're looking at and what it means."

{¶ 10} As Lipian began to testify regarding a drawing prepared by him and his staff that purported to depict the accident scene to scale, counsel for Fry approached the bench, and the following exchange occurred:

{¶ 11} "MR. THIEMAN: Mr. Lipian—I don't think he can compare that. He didn't scale it out. He didn't perform these things and he doesn't have personal knowledge. * * *

{¶ 12} " * * *

{¶ 13} "MR. RODERER: Well, I think he has personally been there. I think his staff has gone which he relies on to maintain things. I think they've been created within the ordinary course of business and he's got everything he needs to be able to testify about the area and the scale and all the matters incidental thereto.

{¶ 14} "MR. THIEMAN: His report says he didn't—and he wasn't there. He said his staff went out there.

{¶ 15} "MR. RODERER: He's been there since his trip down here. You know, it's just like any other expert. Any other expert can rely on data and staff members, such as nurse's notes and things like that in a hospital.

{¶ 16} "MR. THIEMAN: Not in State court. Federal Court they can."

{¶ 17} The court then excused the jury and allowed counsel for Fry to conduct a voir dire of Lipian as follows:

{¶ 18} "Q. Mr. Lipian, have you ever been to this scene?

{¶ 19} "A. Yes.

{¶ 20} "Q.   When were you there?

{¶ 21} "A.   Yesterday.

{¶ 22} "Q.   Was that the first time?

{¶ 23} "A.   The first time that I've personally been there, yes.

{¶ 24} "Q.   * * * And there's snow on the ground of course?

{¶ 25} "A.   That's correct.

{¶ 26} " * * *

{¶ 27} "Q.   What time of day were you there?

{¶ 28} "A.   Just after sunset.

{¶ 29} "Q.   So it was dark out?

{¶ 30} "A.   Yes.

{¶ 31} " * * *

{¶ 32} "Q.   But by and large the area has been covered with what, perhaps six, seven inches of snow?   I might be exaggerating, it might be four or five. Something, right?

{¶ 33} "A.   The ground itself, the area off the road and the berm is snow covered.

{¶ 34} "Q.   * * * And would it be fair to say that you were unable to take measurements of this scene?

{¶ 35} "A.   I didn't need to take measurements yesterday cause my staff had already done that, so I didn't take any last night.

{¶ 36} "Q.   And who on your staff took those measurements?

{¶ 37} "A.   Troy Hahn and Dale Meyer.   They did it with a total station.

{¶ 38} " * * *

{¶ 39} "Q.   And what is a total station?

{¶ 40} "A.   It's [the] same instrument that a surveyor uses.   In my profession we call it forensic mapping, so it's laser transit.   It's where a theodolite, which is an infrared laser measuring device, is mounted on the tripod.   The other person walks around with a prism pole and using the same technique that a surveyor would the scene is electronically mapped.   The data is then put into an electronic data collector, brought back to our office where we can then print out the data and then we can incorporate anything else that would be done in the form of police measurements or other measurements.   And I was involved in the process of rendering the scale drawing when my staff came back with the electronic measurements and they took a lot of photographs and videotape as well.

{¶ 41} "Q. * * * So this scaled drawing that we're looking at, it's got two foam boards taped together, right?

{¶ 42} "A. Yes.

{¶ 43} "Q. It was something that you had a part in preparing, correct?

{¶ 44} "A. Correct. Once the data collector is brought back to the office.

{¶ 45} "Q. And the data upon which this drawing is based is data gathered by someone other than you, correct?

{¶ 46} "A. Two of my employees, yes.

{¶ 47} " * * *

{¶ 48} "Q. * * * You also did some friction valuation testing of the surface of the pavement, right, with a VC2000 accelerometer?

{¶ 49} "A. Yes.

{¶ 50} "Q. And when I say you, you didn't personally do that, did you?

{¶ 51} "A. No, that was done by Troy Hahn."

{¶ 52} Counsel for King then inquired as follows:

{¶ 53} "Q. All the things that were done to make this drawing and to measure these co-efficient defriction [sic], were they things that have been done in the ordinary course of business of your firm?

{¶ 54} "A. Yes, under my direction I told them what I wanted done, and when they brought back the electronic measurements I reviewed them in paper format as well as on the computer. This is the ordinary way we do it. I cannot always be at every scene inspection when the time is available. So my staff is all certified in the use of the total station, we're all certified forensic mapping specialists.

{¶ 55} "The electronic measurements, it's not like if you're the hand tape [sic] where you can write down the wrong number. The data collector knows exactly where the pole is shot each time. The electronic measurements are in paper format and then I look at the format once it's done electronics [sic], and then I look at the scaled drawing and compare it with photographs. So it's not just taken in a vacuum. There's an actual process that we go through that I was involved with.

{¶ 56} "Q. What kind of qualifications does Troy Hahn have?

{¶ 57} "A. Troy Hahn is a retired Trooper from the highway patrol with 26 years of service. He is an ACTAR accredited reconstructionist. He is a certified forensic mapping specialist and an advanced certified forensic mapping specialist

certified by Cara Corporation, which is a company that manufactures the theodolite and the total station.

{¶ 58} "Q. * * * What about the other gentleman you mentioned, Dale, was it Meyer?

{¶ 59} "A. Yes. Dale Meyer has been with me for 12 years. He's a retired Sergeant from the Ohio State Highway Patrol from the Sandusky Post. He likewise is an ACTAR accredited reconstructionist. He likewise is certified by Cara Corporation as a forensic mapping specialist and an advanced forensic mapping specialist.

{¶ 60} "Q. From your personal observations of the scene, does this scaled drawing appear to fairly and accurately depict the layout of that particular stretch of roadway and all the landmarks incidental thereto?

{¶ 61} "A. It does.

{¶ 62} "Q. And you examined photographs and video of this particular area?

{¶ 63} "A. Correct, including Google Earth satellite photographs where I could compare the geometry and the position of objects and compare it to the scaled drawing.

{¶ 64} "Q. And you personally did those things?

{¶ 65} "A. Yes, I did.

{¶ 66} "Q. And again, based on those investigations does the scaled drawing fairly and accurately depict the layout of this intersection and all the geographical markings thereto?

{¶ 67} "A. Yes, sir."

{¶ 68} Counsel for Fry then asked the following follow-up questions:

{¶ 69} "Q. The scaled drawing that we're looking at here is based upon measurements made with a prism and so forth, correct?

{¶ 70} "A. Yes.

{¶ 71} "Q. And a pole that holds up like a surveyor would use, correct?

{¶ 72} "A. Yes.

{¶ 73} "Q. And that was made by someone other than you, correct?

{¶ 74} "A. Yes, sir. Troy Hahn and Dale Meyer.

{¶ 75} "Q. Yes. And those measurements are not something that you personally observed or verified, correct?

{¶ 76} "A. I can verify them when they came back and it was drawn to scale, such as I said comparing it with Google Earth satellite mapping and the photographs that they took back.

{¶ 77} "Q. But you are basing it solely upon what their measurements were, because you didn't make 'em? Let me put it another way. You were relying upon their measurements, correct?

{¶ 78} "A. I'm relying upon their measurements and then once the measurements are drawn to scale I can compare the accuracy of their measurements to photographs. But yes, I'm relying on the actual measurements which were taken by the instrument.

{¶ 79} "Q. And they drew it from scale based on their measurements?

{¶ 80} "A. No, they didn't draw it to scale. My draftsman and I drew it to scale.

{¶ 81} "Q. * * * So as far as drawing it for scale, did you draw it to scale or your draftsman or both?

{¶ 82} "A. It's a computer assisted drafting system. So my draft[s]man's hands were on the mouse and the keyboard, I was with him, so he is the specialist in the CAD, so I sat down with him when this drawing was done. There are aspects that I wanted included, such as the dimensions of the intersection, so two of us were involved but Scott's hands were on the mouse.

{¶ 83} "Q. * * * I understand that and I don't want to diminish that, but the fact of the matter is whatever that draftsman was doing, again, it was based upon measurements taken by your staff, correct?

{¶ 84} "A. Correct.

{¶ 85} "Q. Now the opinions you intend to render here today are based upon those measurements; aren't they?

{¶ 86} "A. In part, yes.

{¶ 87} "Q. Your opinions regarding speed are based upon the measurements, correct?

{¶ 88} "A. In part. I mean, there's photographs that were taken of a skid mark, I believe by your client, plus the deposition testimony as to where the motorcycle came to a final rest. Once it's described verbally, plotting the final rest position of the motorcycle that's in testimony on the scaled drawing became part of that process.

{¶ 89} "Q. But your opinions regarding speed were in part based upon measurements, correct?

{¶ 90} "A. Yes.

{¶ 91} "Q. All right. And you also said you looked at photographs and other things. I understand that.

{¶ 92} "A. Yes, sir.

{¶ 93} "Q. * * * And other of your opinions were based upon measurements, correct?

{¶ 94} "A. There's really two measurements, the position and the length of the skid mark that was photographed by your client, we were able to position that on the scaled drawing based on what we could see in the photograph and then there was descriptions including icons placed on scaled drawings which were Exhibits to the depositions as to where the motorcycle came to final rest. Once the various deponents placed the motorcycle at final rest, since the drawing was to scale, I could measure the distance that the motorcycle traveled after the skid mark."

{¶ 95} Counsel for Fry then argued, "[U]nder Rule [703] facts or data in the particular case upon which an expert bases his opinion or inference may be those perceived by the expert which they were not, or admitted into evidence at the hearing, and there's been no measurements admitted except the length of the skid mark that I can remember. So he can't do it based upon the [data] of others."

{¶ 96} Counsel for King responded, "We have one, two, three, four, five roughly, drawings created by witnesses here in the Courtroom and created by them in their depositions that Mr. Lipian has reviewed and I'm gonna ask him questions on these drawings. There's not been any objection to any of these things. They've been admitted into evidence, I guess we're not to the point where they've been submitted yet, but there's not been any objection to any of these witnesses that * * *—we've asked any questions about any of these things.

{¶ 97} " * * * Mr. Lipian has clearly explained how the document was created, he has personally verified the data by comparing it to photographs, Google Earth, he's personally visited the area. No, he's not the one that took the measurement but his staff did. They have the training to do it and he's personally verified the accuracy. So I think * * * he's certainly done everything that an expert would need to do in order to be able to testify about this."

{¶ 98} Counsel for Fry asserted, "The drawings that he's referring to, those large paper drawings that we've seen all through the trial, none of which have been admitted would reflect the relative positioning of things. But there's been nobody testify that those are made to scale and they're all made by the same company, Introtech. Witnesses used them but no testimony that they're to scale."

{¶ 99} The court determined: "I'm going to permit the testimony because the scale has been verified by an independent source, and that would be the Google Earth verification. I realize that may not be the last word on accuracy, but I think it goes to the weight of the testimony and not the admissibility of it. I think the minimum threshold of admissibility has been met and the rest will go to weight."

{¶ 100} Largely consistent with Fry's own testimony, Lipian testified that Fry's skid mark was "18½ to 19 feet long," with a remaining distance of "only 65 feet" to the alleged location of King's vehicle. Lipian opined that Fry was traveling at 41.9 miles per hour when he first applied his brakes and began to skid. Lipian further determined that the "time frame for the motorcycle from where it first began its skid mark to where it would have reached the location where [King's vehicle] would have been had it encroached into the roadway was 1.54 seconds." Lipian then "looked at all these deposition Exhibits to look at the location where various deponents had placed [King's vehicle]. Those deponents had placed it within the intersection. And then I read the deposition of Mr. King and Mr. Fry." Lipian "then had to determine if there was sufficient time within some of those depositions for [King's vehicle] to move forward, encroach into the path of the motorcycle, stop, put it in reverse and back up before the motorcycle would have reached the impact location which again was 1.54 seconds.

{¶ 101} "Some of the deposition Exhibits showed [King's vehicle] being extensively into the actual part of the intersection. So I looked at the time frame in conjunction with where the deponents * * * placed [King's vehicle], and then I also had to consider within the time frame available for Mr. King to basically back up and get out of the way, I had to consider his perception and response time. The time that it would take for him to identify the motorcycle, perceive its approach, decide on a course of evasive action, then stop the [vehicle], put [it] from drive into reverse, and back out of the way. And I looked at those two time frames to see if it was a probable situation.

{¶ 102} " * * *

{¶ 103} " * * * Before you can actually physically act upon what you've decided upon, you have to go through this perception response time. For a normally alert driver, paying reasonable attention to the roadway in responding to a relatively straightforward event, that time frame is 1.5 seconds.

{¶ 104} " * * *

{¶ 105} "That being the case, if Mr. King began to recognize the motorcycle the instant that it came into view and at the time that it was skidding, 1.5 seconds would then only mean he was four one-hundredths of a second away from impact. Obviously four one-hundredths of a second is not enough time to move the foot

from the accelerator to the brake, put it from drive into reverse and back out of the way before the motorcycle reaches the crash location. So some of the descriptions in the various deposition Exhibits, frankly there's nowhere near enough time for Mr. King to have perceived and reacted and taken evasive action to get out of the way. What that means is, if it had occurred the way some of these deposition Exhibits depicted, the motorcycle would have actually crashed into [King's vehicle]."

{¶ 106} Lipian then responded to hypothetical questions assuming the facts as reflected in the deposition exhibits of Jeremy Adams and Fry, and he opined that the set of assumed facts, namely that King's vehicle was in the intersection when Fry's motorcycle began to skid, did not comport with the laws of physics and that the vehicles would have collided if King's vehicle was in the intersection.

{¶ 107} On redirect examination, Lipian responded affirmatively when asked whether his scaled drawing of the scene fairly and accurately depicts "the intersection based on his personal observations and [his] team's observations as well as comparisons to Google Earth."

{¶ 108} Fry directs our attention to *State v. Joseph* (July 24, 1985), Hamilton App. No. C–840751, 1985 WL 8947, and *Shivers v. Cincinnati*, Franklin App. No. 02AP 395, 2002-Ohio-6633, 2002 WL 31722466. In *Joseph*, the defendant was indicted on three counts of sex-related offenses, and the trial court admitted the opinion testimony of a psychologist who interviewed the victim twice. Assistants of the psychologist administered tests to the victim, which were not admitted into evidence, and the assistants, one of whom was a student, did not testify. "Dr. Lippert conceded that his opinion—that the victim of the sexual conduct charged in the indictment is 'diminished, that he is limited in capacity to make decisions, * * * is mentally retarded'—was predicated upon the extensive tests performed by others." The First District determined that since records of the tests were not admitted, the defense "had no opportunity to assay the tests. Admittedly, the doctor had some personal knowledge about the victim, but the doctor in testifying relied heavily upon records of tests primarily administered by others. In other words, the doctor had no personal knowledge of most of what the test results showed." The appellate court remanded the matter for further proceedings.

{¶ 109} In *Shivers*, the Tenth District determined that defendant's expert-witness testimony regarding the adequacy of security in a dormitory lacked a proper foundation when the expert "explicitly testified he based his opinion on his interviews with the head of the residence halls and the campus chief of police. Neither the head of residence halls nor the campus chief of police testified at trial, and no deposition testimony concerning their conversations with defendant's expert was admitted at trial. As a result, the university's expert based his

opinion on facts or data not admitted at trial. Moreover, the university's expert admitted he did not visit Daniels Hall prior to rendering his opinion, so his opinion could not have been based in whole, or in major part, on facts or data perceived by him." 2002-Ohio-6633, 2002 WL 31722466, at ¶ 24.

{¶ 110} King relies upon *State v. Mitchell*, Columbiana App. No. 05 CO 63, 2008-Ohio-1525, 2008 WL 850179, in which the Seventh District determined that an autopsy report is admissible as a business record of the coroner's office even though no employee of that office made the report. A physician at the Cuyahoga County Coroner's Office prepared the autopsy report, while a Columbiana County Coroner testified at trial. "He stated that upon learning of the victim's death, he sent an investigator to the crime scene who examined the body, took photographs and arranged to have the body transported to Cuyahoga County for a forensic autopsy. * * * He explained that his office has a contract with the Cuyahoga County Coroner's Office to perform forensic autopsies. * * * [He] testified that he received the autopsy report and autopsy photographs from Cuyahoga County in the regular course of business." Id. at ¶ 94. Mitchell objected to the admissibility of the autopsy report in the absence of the testimony of the physician at the Cuyahoga County Coroner's Office and to the testimony of the Columbiana County Coroner, asserting that the "report is testimonial in nature and thus is inadmissible hearsay where the declarant failed to testify." Id. at ¶ 98. Alternatively, Mitchell asserted that, if the report is ruled nontestimonial, the state failed to qualify it as a business record. The Seventh District determined that the autopsy report was a business record and not hearsay in reliance upon Evid.R. 803(6). Id. at ¶ 106–107.

{¶ 111} We agree with King and Progressive that Lipian's opinion testimony was properly admitted. In contrast to the expert in *Joseph*, Lipian did not rely "heavily" nor exclusively upon the measurements taken by Hahn and Meyer; he independently verified the accuracy of those measurements, by means of Google Earth, by reviewing photographs and by his own personal observations at the scene. In *Shivers*, the expert witness's opinion was based on facts or data not admitted at trial, namely his interviews with the head of the residence halls and the campus chief of police, and it was not based upon any facts or data perceived by the expert. King's reliance upon *Mitchell* is also misplaced; Mitchell objected to the hearsay nature of the autopsy report, and the Seventh District admitted the report as a business record pursuant to Evid.R. 803(6).

{¶ 112} We further agree with the trial court that the extent to which Lipian verified the measurements that form the basis of his opinions is an issue going to the weight to be given to his opinion and not to its competence or admissibility. As shown above, Lipian explained the bases for his opinions at length, revealing that he personally verified the facts or data at issue by means of Google Earth,

by review of photographs and video, and by on-scene observation, thereby enabling the jury to evaluate the weight to be given to his opinion. Significantly, Lipian's testimony that the skid mark was 18½ to 19 feet in length and that the remaining distance to the intersection from the skid mark was 65 feet is supported by Fry's testimony that the skid mark was 17 to 18 feet and that the distance from its beginning to the center line of Ziegler Road was 79 feet. As in *Solomon,* Lipian's testimony was admissible. Since Lipian's testimony was properly admitted, his sole assignment of error is overruled.

Judgment affirmed.

GRADY, P.J., and FROELICH, J., concur.

GRADY, Presiding Judge, concurring.

{¶ 113} Evid.R. 703 states: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." The complementary provisions of Evid.R. 705 state: "The expert may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data."

{¶ 114} Defendant-appellee King's accident-reconstruction expert, Henry Lipian, indicated that he intended to offer an opinion concerning causation. Lipian testified that he used measurements of the accident scene that were taken by his two assistants to prepare a diagram of the accident scene on which his opinion was based, and which defendant-appellee King intended to also offer in evidence.

{¶ 115} Plaintiff-appellant, Fry, objected, arguing that because the measurements made by Lipian's assistants were not admitted in evidence, Lipian's proposed testimony concerning causation based on those measurements was inadmissible pursuant to Evid.R. 703. In that event, neither could the diagram based on those measurements be offered in evidence through Lipian's testimony, because his reliance on his assistants' measurements was hearsay. Evid.R. 801 and 802.

{¶ 116} In a voir dire examination, and with respect to his own perceptions, Lipian testified that he visited the scene of the accident the night before, adding: "I didn't take any measurements yesterday cause my staff had already done that, so I didn't take any last night." Lipian explained that "it was probably dark" when he visited the accident scene. Lipian testified that he would rely instead on photographs and a video of the area, "including Google Earth satellite photographs where I could compare the geometry and the position of objects and compare it to the scaled drawing" prepared from his assistants' measurements.

{¶ 117} The court overruled Fry's Evid.R. 703 objection and permitted Lipian to testify on the basis of the diagram exhibit he prepared from the measurements taken by his assistants, stating:

{¶ 118} "I'm going to permit the testimony because the scale has been verified by an independent source, and that would be the Google Earth verification. I realize that may not be the last word on accuracy, but I think it goes to the weight of the testimony and not the admissibility of it. I think the minimum threshold of admissibility has been met and the rest will go to weight."

{¶ 119} Lipian disclaimed any reliance on his visit to the scene of the accident as a basis for his opinion. The trial court placed no reliance on it, and neither should we. Lipian's reliance on photographs and videos admitted in evidence is problematic, to the extent that he compared them to the diagram prepared from his assistants' measurements to arrive at an opinion. Instead, Lipian relied on Google Earth to verify those measurements, and the trial court held that Evid.R. 703 was satisfied on that basis.

{¶ 120} Evid.R. 703 contains no provision for verification of facts or data not admitted in evidence. To do that, the expert must rely on facts or data he perceived, the alternative grounds for admissibility in Evid.R. 703. Consistent with Evid.R. 602, those perceptions must be the expert's "firsthand perceptions." Weissenberger, Ohio Evidence Treatise (2010 Ed.), Section 703.1. Lipian's firsthand perceptions were of Google Earth, not the scene of the accident.

{¶ 121} As it was employed by Lipian, Google Earth is a technical procedure on which Lipian based his testimony. Lipian's reliance on that procedure is governed by Evid.R. 702(B)(1), (2), and (3), which impose tests formulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, for the court's determination of the expert's qualifications and the reliability of any tests or procedures he performed, not the admissibility of the expert's testimony. No evidence was offered demonstrating that Google Earth satisfies the requirements of Evid.R. 702(B), and the court made no findings that it does.

{¶ 122} Evid.R. 703 is a rule of admissibility and is concerned with adjudicative facts: "facts or data * * * perceived by the expert or admitted in evidence at the hearing." Further, and unlike the standards in Evid.R. 702(B) regarding qualifications of the expert and the reliability of tests and procedures he performs, which involve a degree of deference by the court, the standards for admissibility imposed by Evid.R. 703 are narrow and specific. The two rules and their concepts should not be confused in their application to cause the court to defer to an expert's pronouncements in determining whether the adjudicative facts on which the expert relies satisfy the admissibility requirements of Evid.R. 703. See

Imwinkelreid, The 'Bases' of Expert Testimony: The Syllogistic Structure Of Scientific Testimony (1998), 67 N.C. L.Rev.1.

{¶ 123} A technical procedure the expert performed may qualify as firsthand knowledge when the procedure was found to satisfy the requirements of Evid.R. 702(B). *State v. Minor* (1988), 47 Ohio App.3d 22, 546 N.E.2d 1343. However, in the present case, no such finding was made concerning Lipian's use of Google Earth. Instead, the court accepted Lipian's reliance on the Google Earth procedure, based on nothing more than the fact of that reliance, to find that the admissibility requirements of Evid.R. 703 were satisfied. In so doing, the court applied the deferential standard in Evid.R. 702 to an admissibility issue under Evid.R. 703, which instead imposes a narrow and strict standard.

{¶ 124} The trial court erred when it overruled Fry's objection to Lipian's testimony based on the measurements performed by his assistants because Lipian verified those measurements using Google Earth. Nevertheless, an error in the admission of evidence is not a basis for setting aside a verdict "unless refusal to take such action appears to the court inconsistent with substantial justice." Civ.R. 61.

{¶ 125} I agree with the majority that Lipian's alternative reliance on Fry's own testimony concerning the speed at which his motorcycle was traveling and the measurements of the skid marks it left comfortably support the reasons Lipian gave for his opinion that King could not have backed his vehicle out of the intersection, as Fry claimed King had, in the time available to him to do that. Just as damaging to Fry's negligence claim, and perhaps even more damaging, was Lipian's stated opinion that Fry could not have laid his motorcycle down to avoid colliding with King's vehicle, as Fry said he did, because the physical principle of gyroscopic procession would have prevented that from happening. Any error in overruling Fry's objection concerning Lipian's reliance on the measurements his assistants performed was therefore harmless. Civ.R. 61. I would affirm the judgment for King on that basis.

FROELICH, Judge, concurring.

{¶ 126} I concur with Judge Donovan that the expert's testimony was admissible because he verified the measurements that were taken by his staff. I also concur with Judge Grady that this verification could not be by means of Google Earth, but I find the record sufficient to support a finding that the expert, by examining photographs that were admitted and his personal view of the scene, could render his own opinion without relying on the independent measurements of his staff.

{¶ 127} Appellee argues that the staff measurements were admissible as business records pursuant to Evid. R. 803(6). Appellee's reliance on *State v.*

*Mitchell,* Seventh District No. 05CO63, 2008-Ohio-1525, 2008 WL 850179, is questionable in light of that district's subsequent opinion in *State v. Lanier,* Mahoning App. No. 09 MA 97, 2010-Ohio-6382, 2010 WL 5541690, which took account of *Melendez–Diaz v. Massachusetts* (2009), 557 U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314. Such a broad reading, especially when the data was collected in anticipation of litigation, could eviscerate Evid.R. 703, which requires personal observation or that the factual basis of the opinion otherwise be admitted into evidence.